**Ricardo CORRALES and Zulema Frias, Appellants,**

v.

**DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee.**

**No. 08–04–00026–CV.**

Court of Appeals of Texas, El Paso.

Nov. 18, 2004.

Alex A. Melendez, John L. Williams, El Paso, for Appellants.

Lana Shadwick, Texas Department of Protective & Regulatory Services, Houston, Lyda Ness, El Paso, for Appellee.

Lucia Quevedo, El Paso, court appointed advocate for the children.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

ANN CRAWFORD McCLURE, Justice.

This is an accelerated appeal pursuant to Texas Family Code section 263.405(a). *See* Tex.Fam.Code Ann. § 263.405(a)(Vernon 2002)(since September 1, 2001, an appeal from a final order terminating the parent-child relationship and appointing another as managing conservator is accelerated and governed by the rules for accelerated appeals in civil cases). The Texas Department of Protective and Regulatory Services filed a petition to terminate the parental rights of Zulema Frias and Ricardo Corrales as to three of their five children. The jury found that the parent-child relationship should be terminated and named the Department as managing conservator. On appeal, the parents complain of evidentiary error and the failure of the court to appoint the maternal grandmother as managing conservator. We affirm.

## FACTUAL SUMMARY

Frias and Corrales began living together in 1997 and married in January 2000. Their first child, Jason, was born with physical problems including blindness and mental retardation. He tested positive at birth for alcohol and cocaine. When he was released from the hospital, Frias's mother, Maria Elena Olivas, took him home with her. She was responsible for his oxygen machine and heart monitor. Frias eventually relinquished her parental rights to Jason and Olivas adopted him.

The three children at issue are David Justin Frias, Ricardo Corrales, Jr., and Joylin Zulema Corrales. Justin was born with pallet problems causing a speech impediment. Olivas cared for him from the time he was six or seven months old. She has cared for Ricardo, Joylin, and Jeremiah, the youngest child, since birth. The case involving Jeremiah was still pending at the time of trial, and he was living with Olivas.

Corrales is in jail in Juarez, Mexico for possession of heroin. He has been in and out of jail five times during the marriage

and is scheduled for release in December 2005. It was his intention that Olivas care for the children while he was incarcerated.

Frias testified she has been using drugs for nine years, is addicted to cocaine, and had used cocaine as recently as three weeks before trial. She admitted that she used drugs during her pregnancies. Both her husband and her mother were aware of her drug use and Olivas had been taking care of the children because of it. Frias claimed that she did not use drugs in front of her children. She described her withdrawal symptoms as anxiety, vomiting, diarrhea, and insomnia, and she acknowledged that she was unable to care for the children in that condition. Frias also admitted that she had been arrested numerous times for theft, driving while intoxicated, family disturbance, and prostitution.

The Department began its investigation in March 2001 because of an allegation that Olivas's boyfriend, Manuel Payan, had physically abused Ricardo. Georgina Estrada Martinez, an intake investigator for the Department, was unable to determine whether the abuse occurred. The child suffered no injuries and was unable to verbalize what had happened due to a speech impediment and developmental delay. But Martinez did conclude that Frias had neglected to properly supervise Justin and Ricardo to the extent that the home was not an appropriate environment for them. Payan was arrested for assaulting Frias and for injury to a child. A sixty-day protective order banned Payan from the home. Martinez informed Corrales about the circumstances, but he wanted the children placed with Olivas or an aunt and expressed no concern about the domestic violence in the home.

Martinez also met with Frias and noticed fresh track marks on her arms. Frias was pregnant with Joylin at the time. She was using cocaine every other day and had received no prenatal care. Martinez also spoke to Olivas, who confirmed Frias's drug usage. Frias was placed in a drug treatment program. Justin was placed with Olivas while Ricardo was placed with Frias's sister Annabelle. Olivas was instructed that Frias should not be in the home. The case was then assigned to John Estrada in the family preservation unit at the Department.

Estrada testified that he had tried to preserve the family for a year and a half during which he had concerns about the children's well being due to their mother's drug use. Frias and Olivas were offered a number of services including drug treatment, day care for the children, referrals to the Texas Workforce Commission, and assistance with housing. They ultimately terminated the day care service because it was too difficult to get all the children downstairs from the grandmother's second floor apartment to be picked up. Frias lived with her mother off and on and would visit the children when she was not living there. Despite the Department's instructions, Olivas allowed Frias ready access to the children.

In August 2002, Estrada conducted a routine home visit and found the three children alone with Frias. She appeared to be anxious, hung over, under the influence of drugs, and aggressive. The children appeared to be taking care of themselves. The house was in disarray and there were knives on the kitchen table within reach of the children. Frias told him she had used cocaine the night before and had been involved in an altercation. She explained she was watching the children because Olivas had taken Jason to register for school. The children were removed from their grandmother and placed in foster care. Estrada believed that caring for four children under eight years of age was a handful for one person.

.

These circumstances were even more difficult because one of the children was blind and mentally retarded. Estrada testified that Olivas had contacted him because she felt overwhelmed.

Frias testified that she wanted the children placed with Olivas if parental rights were terminated because she wanted to continue to see them. The children loved their grandmother and would cry when they were taken back to the foster home. Frias claimed her mother took good care of the children whereas they had experienced problems in foster care. Joylin suffered from diaper rash and was neglected when the foster mother's grandchild came to stay. Ricardo was beaten and always had some kind of injury. Justin was scolded and punished by the foster mother and was now hyperactive and on medication. He had been in the first grade but was put back into kindergarten. Frias complained to the case worker about the foster care.

She also described the children's interaction with their other siblings at their grandmother's house. Jason loved the children and would cry when the visits ended. The children would also ask for Jason. She admitted that four of her brothers and sisters had a drug-related criminal history, but her eleven nieces and nephews had spent time with the children.

Case worker Eunice Buendia asked the jury to terminate the parental rights and to appoint the Department as managing conservator. She saw problems with allowing the grandmother to parent the children. Two homes studies were negative. Olivas could not read or write. She was still dating Payan. She minimized her children's drug usage. She already cared for a special needs child who was blind and mentally retarded. She was unable or unwilling to keep Frias away from the children, was involved in altercations with Frias about money, and had been arrested herself. Buendia admitted that another home study had been conducted back in 1998, and the home was determined to be appropriate for Jason. She conceded that his needs were being met and there was no eminent danger to Jeremiah, the youngest child. But she did not waiver in her view that the home was not appropriate for these three children.

Family therapist Martha Dominguez and counselor Blanch Kelly testified that Frias had been referred to them for services but never showed up for her appointments. Marriage and family therapist Iliana Jacobson provided services for Frias and thera-play sessions for Frias, the foster mother, and the three children. Jacobson testified that Frias recognized the loss suffered by her children due to her drug use but did not understand the resulting emotional damage. She characterized Frias as unmotivated since she did not believe she had a drug problem. While Frias characterized her family as supportive, Jacobson felt that the family was enabling her addiction. Frias was cooperative during the thera-play sessions and attended six of eight sessions. Justin was initially cooperative but began to withdraw and did not respond to hugs from his mother. Jacobson was concerned about the relationship because the child seemed oppositional. Ricardo and Joylin were hyperactive at the first few sessions but later improved and responded to structure. Jacobson found that the children needed constant supervision. She had no concerns about the children while in the care of their foster parents and found that the children had a bond with their foster mother.

Psychotherapist Sergio Medina testified that Justin was very protective about his early life and had severe speech delay which was improving with therapy. He seemed to have a bond with his foster mother but had expressed a desire to live

with Frias. The child also felt close to Olivas and wanted to live with her. Medina found that Justin did not play well with his siblings and needed structure, supervision, attention, redirection, and help in school since he was behind his age group in learning. At the time of trial, Justin was taking three medications—Zyprexa for bipolar manic disorder, Premarin for depression, and Adorexal for hyperactivity. Medina wanted to use behavior modification to wean Justin off the medications. He believed Justin's depression had improved and his aggression and lying had decreased although there were still isolated incidents of stealing. Medina reported there was a high risk that the problems would worsen if he returned to his prior environment. It was in Justin's best interest to be in a drug- and violence-free home. Medina explained that the foster mother had initially indicated a desire to adopt Justin but had moved away from the idea because of the child's behavior. He admitted it may be difficult to find Justin a home. While foster care had demonstrated that the three children could live and learn together, Medina believed the children should be separated due to Justin's needs for attention and the contemptuous relationship between the siblings.

Lucia Margarita Quevedo, the court-appointed guardian ad litem, concluded it was not in the children's best interest to have a continuing relationship with their biological family. Although the grandmother had expressed a desire to care for the children, Quevedo believed that Olivas was not able to care for five young children on her own, that Frias would be in and out of the children's lives, and that Frias's siblings were not a positive influence on the children. Justin had expressed a desire to stay with his foster parents and never mentioned living with his grandmother. Due to speech therapy, Justin and Ricardo were making progress.

The foster mother helped Justin with his exercises and homework and the children had a relationship with her twelve-year-old son.

Olivas testified that only her daughter Magdalena spent a significant amount of time at her home. She denied allowing Frias access to the children. Drugs were not used in her home although she had seen Frias under the influence. The children played well together, and Justin behaved since she did not allow fighting. The children suffered no injuries while in her care, and she denied telling Estrada that she felt overwhelmed by the burden. She considers the children to be her own, and they call her grandmother and cry when the visits end. Olivas said the children wanted to live with her and she believed it was in their best interest to remain in her care. She planned to bathe the children at night so she could get them to school in the morning. She promised to take Justin and Ricardo to speech therapy. She also felt she was a better parent now due to her experience and age.

## EVIDENTIARY ERROR

In Point of Error One, Appellants contend that the trial court erred in admitting police reports which contained inadmissible hearsay. They argue that the reports contained the results of police investigations which included testimony from witnesses who were not present for trial and unavailable for cross-examination.

The police reports were introduced during the direct examination of Crystal Barraza, custodian of records for the El Paso Police Department. Counsel for the Department laid the predicate to admit the reports as business records. Counsel for Frias objected as to relevance and hearsay. Counsel for Corrales argued that the

reports were more prejudicial than probative. The judge overruled the objections.

### Standard of Review

 The admission and exclusion of evidence is committed to the trial court's sound discretion. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Stated differently, the appropriate inquiry is whether the ruling was arbitrary or unreasonable. *Smithson v. Cessna Aircraft Company*, 665 S.W.2d 439, 443 (Tex. 1984); *Landry v. Travelers Insurance Co.*, 458 S.W.2d 649, 651 (Tex.1970). The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Southwestern Bell Telephone Co. v. Johnson*, 389 S.W.2d 645, 648 (Tex.1965); *Jones v. Strayhorn*, 159 Tex. 421, 321 S.W.2d 290, 295 (1959).

### The Applicable Rules

"Hearsay is not admissible except as provided by statute or these rules or by other rules prescribed pursuant to statutory authority. Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay." Tex.R.Evid. 802. Rule 803 provides exceptions to the exclusionary nature of Rule 802. Subsection (6) provides an exception for business records:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by affidavit that complies with Rule 902(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. 'Business' as used in this paragraph includes any and every kind of regular organized activity whether conducted for profit or not.

Tex.R.Evid. 803(6). Subsection (8) states the exception for public records:

Records, reports, statements, or data compilations, in any form, of public offices or agencies setting forth: (A) the activities of the office or agency; (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding in criminal cases matters observed by police officers and other law enforcement personnel; or (C) in civil cases as to any party and in criminal cases as against the state, factual findings resulting from an investigation made pursuant to authority granted by law; unless the sources of information or other circumstances indicate lack of trustworthiness.

Tex.R.Evid. 803(8).

### Appellants' Arguments

Appellants argue that the police reports did not fall within the category of records kept in the regular course of business since the officer compiling the report may be the source of the knowledge but not have personal knowledge of the events. In support of this argument, they direct us to *Cole v. State*, 839 S.W.2d 798, 811–12 (Tex. Crim.App.1992).

In *Cole*, the defendant was convicted of aggravated sexual assault. At issue was whether the trial court properly admitted hearsay evidence concerning the results of testing performed by a chemist who was unavailable at trial. The State had sought to introduce letter reports from the chemist in which he disclosed the results of tests conducted upon physical evidence collected upon the medical examination of the victim. The reports were admitted through the testimony of the supervising chemist at the same laboratory. On appeal, the defendant argued that the admission of the chemist's hearsay statement was in contravention of that portion of Rule 803(8)(B) which prohibits as hearsay "matters observed by police officers and other law enforcement personnel." The Court of Criminal Appeals concluded that the letter reports were inadmissible since they involved "matters observed" by "other law enforcement personnel." *Id.* at 805. The court then considered whether hearsay evidence which does not qualify as a public record could nevertheless qualify as a business record. Believing this to be inconsistent with the intended effect of the rules, the court concluded that Rule 803(6) could not be used as a "back door" for evidence inadmissible under Rule 803(8)(B). *Id.* at 811.

Appellants also argue that the reports were not admissible as public records and direct our attention to *Kratz v. Exxon*, 890 S.W.2d 899 (Tex.App.-El Paso 1994, no writ). There, the plaintiff tried to admit the written statements of two eyewitnesses pursuant to the public records exception. *Id.* at 904. This court found in dicta that the statements did not fit within the exception since they did not set forth the activities of the office or agency, did not involve matters observed pursuant to a duty imposed by law as to which there was a duty to report, and did not constitute factual findings resulting from an investigation made pursuant to authority granted by law. *Id.* at 905. In a footnote, the court stated that "[r]ule 803(8) would be applicable only if the statement were prepared by public officials or employees under their supervision in the performance of their official duties." *Id.* at n. 3. While the officer's factual findings in the report qualified as a public record, the statements of the witnesses did not. *Id.* at n. 5; *see also Carter v. Steere Tank Lines, Inc.*, 835 S.W.2d 176 (Tex.App.-Amarillo 1992, writ denied)(holding accident report admissible but not the statements contained within the report).

### Application

Generally speaking, the police reports were admissible as a public record. They set forth the activities of the police department, involved matters observed pursuant to a duty imposed by law as to which there was a duty to report, and contained factual findings resulting from an investigation made pursuant to authority granted by law. Tex.R.Evid. 803(8). Moreover, the exclusion of matters observed by police officers and other law enforcement personnel applies only to criminal proceedings. *See* Tex.R.Evid. 803(8)(B).

We recognize of course that the records also contained statements by witnesses which did not qualify as public records. *See Kratz*, 890 S.W.2d at 905, n. 3. Nevertheless, the rule provides that the reports are admissible unless the sources of information indicate a lack of trustworthiness. *See* Tex.R.Evid. 803(8). In other words, there is a presumption of admissibility and the burden is placed on the party opposing the admission of a report to show its untrustworthiness. *Beavers v. Northrop Worldwide Aircraft Services, Inc.*, 821 S.W.2d 669, 675 (Tex.App.-Amarillo 1991, writ denied). Appellants object-

ed on the basis that the reports included testimony from witnesses not at trial, but did not specifically indicate which statements were untrustworthy. We conclude they have failed to meet their burden to show untrustworthiness. *See Beavers,* 821 S.W.2d at 675.

### Harm Analysis

Even assuming error occurred, Appellants still must demonstrate harm. Tex.R.App. P. 44.1. To constitute an abuse of discretion, we must find that the error probably caused the rendition of an improper judgment. *See* Tex.R.App.P. 44.1(a)(1). A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *Texas Dept. of Transp. v. Able,* 35 S.W.3d 608, 617 (Tex.2000). Appellants argued that admission of the reports was harmful to Frias and may have prejudiced the jury on naming the managing conservator of the children since a number of the records mentioned the grandmother and portrayed her in a less than flattering light.

In determining if the evidence probably resulted in the rendition of an improper judgment, we must review the entire record. *Id.* Reversible error seldom occurs when the evidence in question is cumulative and not controlling on a material issue dispositive of the case. *Gee,* 765 S.W.2d at 396, *citing Whitener v. Traders and General Ins. Co.,* 155 Tex. 461, 289 S.W.2d 233, 236 (1956). The police reports encompassed the following incidents: a complaint against Frias for the use of cocaine causing premature delivery of her child; Frias's arrest for theft from Dillard's; her arrest for theft from the Family Dollar; her arrest for theft from her mother; her arrest for prostitution; her arrest for interfering with an investigation; her two arrests for driving while intoxicated; her arrest on an outstanding warrant; a report of her assault on her mother; a complaint against Manuel Payan for assault; his arrest for injury to a child; and Mario Gandara's arrest for possession of marijuana.

Frias testified that she had been arrested on many occasions for theft, driving while intoxicated, family disturbances, assault, interfering with an investigation, and prostitution. She admitted using cocaine during all her pregnancies. One of her children was born addicted to drugs and was blind and mentally retarded; another was born prematurely due to her drug usage. An investigator for the Department testified that there had been allegations of physical abuse by Manuel Payan against both Frias and one of the children.

Based on the record, we conclude that admission of the police reports was merely cumulative of the evidence already in the record. Appellants have failed to show that error, if any, probably caused the rendition of an improper judgment. Point of Error One is overruled.

## APPOINTMENT OF A MANAGING CONSERVATOR

In Point of Error Two, Appellants complain that the trial court abused its discretion in failing to appoint the grandmother as managing conservator of the children. The jury charge included the following question:

> Should the Texas Department of Protective and Regulatory Services or a Suitable, Competent Adult be named managing conservator of the children?

> Answer by writing 'DEPARTMENT' or 'SUITABLE, COMPETENT ADULT' (SPECIFY) as to each child.

The jury named the Department as each child's managing conservator.

## Standard of Review

At the outset we find it necessary to re-frame the issue on appeal. In contending that the trial court abused its discretion, Appellants specifically reference Section 161.207 of the Family Code, which provides in pertinent part that if the court terminates the parent-child relationship with respect to both parents, it shall appoint a suitable, competent adult or the Department as managing conservator. Tex.Fam.Code Ann. § 161.207(a). This section must be read in conjunction with Section 105.002, which authorizes jury trials in all suits affecting the parent-child relationship except a suit in which adoption is sought and a suit to adjudicate parentage. More importantly, subsection (c)(1)(A) mandates that the court may not contravene a jury verdict concerning the appointment of a sole managing conservator. Simply stated, the court may not enter a judgment notwithstanding the verdict. *Lenz v. Lenz,* 79 S.W.3d 10, 20 (Tex. 2002); *In re Marriage of Robinson,* 16 S.W.3d 451, 454 (Tex.App.-Waco 2000, no pet.). It had no discretion to do otherwise. Consequently, we must disagree with all parties that the appropriate standard of review is whether the trial court abused its discretion. Certainly they are accurate in reciting that most orders arising from a suit affecting the parent-child relationship will not be disturbed on appeal unless the complaining party can demonstrate a clear abuse of discretion. But all of the supporting authority for this proposition involves bench trials. *See Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990); *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982); *Bates v. Tesar,* 81 S.W.3d 411, 424 (Tex.App.-El Paso 2002, no pet.); *Hodson v. Keiser,* 81 S.W.3d 363, 367 (Tex. App.-El Paso 2002, no pet.). Here, the appropriate challenge must be directed to a traditional sufficiency review: Is the evidence legally and factually sufficient to support the jury's finding that appointing the Department as the children's managing conservator was in their best interest? *Lenz,* 79 S.W.3d at 16–17.

A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. The standard of review requires a determination as to whether, considering only the evidence and inferences that support a factual finding in favor of the party having the burden of proof in a light most favorable to such findings and disregarding all evidence and inferences to the contrary, there is any probative evidence which supports the finding. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Dayton Hudson Corp. v. Altus,* 715 S.W.2d 670 (Tex. App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.); *Terminix International Inc. v. Lucci,* 670 S.W.2d 657 (Tex.App.-San Antonio 1984, writ ref'd n.r.e.); *Southwest Craft Center v. Heilner,* 670 S.W.2d 651 (Tex. App.-San Antonio 1984, writ ref'd n.r.e.).

There are basically two separate "no evidence" claims. When the party having the burden of proof suffers an unfavorable finding, the proper challenge is that the fact was established as "a matter of law." When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *See Creative Manufacturing, Inc. v. Unik,* 726 S.W.2d 207 (Tex.App.-Fort Worth 1987, writ ref'd n.r.e.). The latter applies here.

"Insufficient evidence" or factual insufficiency involves a finding that is so against the great weight and preponderance of the evidence as to be manifestly wrong. The test for factual insufficiency is set forth in *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). We must consider all of the evidence, both the evi-

dence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. If the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained. This is true even if the finding is supported by more than a scintilla of evidence and even though reasonable minds might differ as to the conclusions to be drawn from the evidence.

■■■■ There are two distinct complaints here as well. When the party having the burden of proof complains of an unfavorable finding, the point of error should allege that the findings "are against the great weight and preponderance of the evidence." The "insufficient evidence" point of error is appropriate only when the party without the burden of proof on an issue complains of the fact findings. *Neily v. Aaron*, 724 S.W.2d 908 (Tex.App.-Fort Worth 1987, no writ). Again, the latter is applicable here.

### Preservation of Error

■■■ We are unable to consider Appellants' factual sufficiency complaints. As we have noted, the case was tried to a jury rather than to the bench. Rule 324(b) requires that a complaint of factual insufficiency of the evidence to support a jury finding must be raised in a motion for new trial. Tex.R.Civ.P. 324(b). Because no motion for new trial was filed, the error has been waived. We will consider legal sufficiency.

### Applicable Law

If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Protective and Regulatory Services, a licensed child-placing agency, or an authorized agency as managing conservator of the child. An agency designated managing conservator in an unrevoked or irrevocable affidavit of relinquishment shall be appointed managing conservator. Tex.Fam.Code Ann. § 161.207(a). The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child. Tex.Fam.Code Ann. § 153.002 (Vernon 2002).

Appellants rely on *Holley v. Adams*, 544 S.W.2d 367 (Tex.1976) as enumerating the principal balancing factors used to determine the best interest of the child. The charge instructed the jury to consider these same factors. In 1993 the Legislature codified *Holley*, incorporating additional factors for the court to consider when reviewing the placement of children under the care of the Department. *In re J.R.P.*, 55 S.W.3d 147, 151–52 (Tex.App.-Corpus Christi 2001, review denied); *see* Act of June 19, 1993, 73rd Leg., R.S., ch. 842, 1993 Tex.Gen.Laws 3318 (amended 1995)(current version at Tex.Fam.Code Ann. § 263.307 (Vernon 2002)). Section 263.307 provides the following factors for determining the best interest of the child:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family

members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

Tex.Fam.Code Ann. § 263.307(a), (b). We will review the evidence in the context of these factors, considering as we must only the evidence and inferences tending to support the jury's finding and disregarding all evidence and inferences to the contrary.

### Analysis

First, the record showed that the children's ages and mental vulnerabilities supported the jury's finding. *See* Tex.Fam. Code Ann. § 263.307(b)(1). At the time of trial, the children were six, three, and two respectively. Justin was born with pallet problems and had a speech impediment. When the Department removed the children from Olivas's home, the house was in disarray, the children were taking care of themselves, and there were knives on the table in reach of the children. A Department investigator testified that the children had been aggressive. At thera-play sessions, Iliana Jacobson found Justin to be withdrawn and unresponsive to his mother. The other two children were hyperactive but later improved and responded to structure. Justin's psychotherapist stated that Justin was on three medications for depression, hyperactivity, and bipolar manic disorder. His behavior had improved with medication but he feared it would regress if he returned to his prior environment. CASA volunteer Margarita Quevedo testified that Justin's and Ricardo's speech had improved with therapy.

Second, the record demonstrated that there was a history of substance abuse by the family or others who had access to the grandmother's home. *See* Tex.Fam.Code Ann. § 263.307(b)(8). The children were ultimately removed from the home since they were left alone with their mother in contravention of Department instructions. After one of Frias's arrests, the Department asked Olivas to notify them when Frias was released. Olivas failed to do so and the Department finally located Frias

at Olivas's home. Frias admitted that she was addicted to cocaine and had used cocaine during all five of her pregnancies. Olivas knew about her daughter's drug use and did nothing to help her with her problem. Jacobson characterized Frias's family as enablers of her drug addiction. While both Frias and Olivas insisted that drugs were not used around the children, Justin told his psychotherapist that his mother poked needles into her arms. Olivas also admitted that Frias would come to the house while still under the influence of drugs. Four of Frias's brothers and sisters had a drug-related criminal history, yet Olivas minimized her children's drug use or professed ignorance of it. The ad litem testified that Frias would be in and out of the children's lives if they were to live with their grandmother and that Frias's siblings were not a good influence.

Third, the record reveals a history of abusive or assaultive conduct by the family or others who had access to the home. *See* Tex.Fam.Code Ann. § 263.307(b)(7). The Department received the case initially because of complaints that Olivas's boyfriend had physically abused Ricardo. Although the Department was unable to determine whether the abuse occurred, Payan was arrested for assault of Olivas and for injury to a child. A sixty-day protective order was entered prohibiting Payan from the home. Yet at the time of trial, Olivas was still dating him. Olivas and Frias had repeated altercations and Frias was arrested for stealing from her mother.

Fourth, the record showed that Olivas lacked proper parenting skills. *See* Tex. Fam.Code Ann. § 263.307(b)(12). Case worker Eunice Buendia testified that she had concerns that there were too many children in the home and Olivas did not discipline them. She had a second-grade education and could not read or write.

She was already caring for Jason who was blind and mentally retarded. Therapist Iliana Jacobson stated that the children needed constant supervision. Justin's therapist testified that he particularly needed structure, supervision, attention, redirection, and help in school. Several witnesses questioned the grandmother's ability to care for five young children on her own, especially when she had already complained of feeling overwhelmed.

We conclude the evidence is legally sufficient to support the jury's determination that the best interest of the children would be better served by appointing the Department as managing conservator. We overrule Point of Error Two and affirm the judgment of the trial court.