**In the Interest of T.T., A.T., D.D., A.D. and A.D.**

**Nos. 14–06–00552–CV, 14–06–00555–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

May 17, 2007.

Julie A. Ketterman, Houston, for appellants.

Trey David Picard, Angleton, for appellees.

Panel consists of Justices FROST, SEYMORE, and GUZMAN.

## OPINION

KEM THOMPSON FROST, Justice.

This is an appeal from a judgment terminating the parental rights of a mother as to five young children and a father as to three of these children. The mother challenges the legal and factual sufficiency of the evidence to support the jury's termination findings and the jury's finding that a state agency, rather than a relative, should be appointed as the sole managing conservator of the children. The father brings these same challenges as to his three children, and he also asserts in a separate issue that the trial court abused its discretion in excluding the testimony of his expert witness. Under the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support the termination of both the mother's and the father's parental rights

and to support the jury's decision as to the sole managing conservator of the children. We also conclude that the father has waived the issue regarding his expert. Accordingly, we affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Johnny and Melissa, a married couple, are the parents of three young children, D.D. (hereinafter "David"), A.D. (hereinafter "Amy"), and A.D. (hereinafter "Addy").[1] Melissa is the mother of two additional children from a previous relationship, T.T. (hereinafter "Tommy") and A.T. (hereinafter "Adrienne").[2] On June 9, 2005, the Brazoria County Children's Protective Services Unit ("CPS"), Texas Department of Family and Protective Services (the "Department"), filed suit to terminate the parental rights of Johnny and Melissa. At that time, David was three years old, the twins Amy and Addy were two years old, Tommy was five years old, and Adrienne was four years old.

Days before the termination suit was filed, three-year old David fell out of a second-story window in his family's apartment while he was playing tag with several other children in the room. When CPS Investigator Sheila Green arrived to investigate the incident, she found the apartment to be messy, dirty, and smelly. Although David's fall was ruled accidental, based on the condition of the apartment, CPS temporarily removed David and his four siblings from his parents' care, placing them with a relative, Hattie Williams. Green informed Johnny and Melissa that the children would be returned if they cleaned up the apartment and made it safe by a designated deadline.

Johnny and Melissa quickly complied with CPS's instructions, contacted Green before the deadline, and asked her to return to re-inspect the apartment. Green discovered that they had done a "great job" in getting the apartment cleaned up; they had repainted, bought some new furniture, and decorated. CPS returned the children to their parents on June 7, 2005. However, around 3:00 a.m. the next morning, four-year old Adrienne was found wandering outside the family's apartment by a neighbor, who, upon returning the child to the family's apartment, found the door unlocked and Johnny and Melissa asleep. Later that day, CPS again removed the children from Johnny and Melissa.[3] This time, after the placement possibilities suggested by Johnny and Melissa were ruled out, CPS placed the children in the foster-care system.

Johnny and Melissa had legal problems when the Department filed suit. Both were on probation for misdemeanor theft-by-check charges in other counties. Because of various probation violations, each also had served time in jail. In fact, during the trial of this case, Melissa was in jail because of a probation violation, and Johnny indicated that it was possible he would be going to jail for a probation violation in the near future.

The case was tried to a jury, which found by clear and convincing evidence that: (1) Johnny and Melissa had placed or knowingly allowed their children to remain in conditions or surroundings that endan-

---

1. To protect the privacy of the parties in this case, we identify the children by fictitious names and the parents by their first names only. *See* TEX. FAM.CODE ANN. § 109.002(d) (Vernon 2002).

2. Tommy and Adrienne's father voluntarily relinquished his parental rights and is not a party to this appeal.

3. Johnny and Melissa were both arrested this same day for outstanding warrants in other counties.

gered the children's physical or emotional well-being; (2) Johnny and Melissa had engaged in conduct or knowingly placed the children with people who engaged in conduct that endangered their children's physical or emotional well-being; (3) Johnny and Melissa failed to comply with provisions of a court order that specifically established the actions necessary for them to obtain the return of their children, who at the time had been in the temporary managing conservatorship of the Department for not less than nine months as a result of their removal for abuse and neglect; and (4) termination of the parent-child relationships is in the best interests of the children. The jury also found by a preponderance of evidence that CPS should be appointed sole managing conservator of the children.

## II. STANDARDS OF REVIEW

Because termination of parental rights is a drastic remedy, due process and the Texas Family Code require the Department to prove the necessary elements by the heightened burden of proof of "clear and convincing evidence." *See* TEX. FAM. CODE ANN. § 161.001 (Vernon 2002); *In re B.L.D.*, 113 S.W.3d 340, 353–54 (Tex.2003). In this case, the Department had to prove by clear and convincing evidence that Johnny and Melissa engaged in the conduct described in subsection 161.001(1)(D), (E), or (O), and that termination of their parental rights is in the children's best interest.[4] *See* TEX. FAM.CODE ANN. § 161.001 (Vernon 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

In reviewing the legal-sufficiency challenges to the jury's termination findings, this court must look at all the evidence in the light most favorable to the termination findings to determine whether a reasonable factfinder could have formed a firm belief or conviction that these finding are true. *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005). Looking at the evidence in the light most favorable to the judgment means that a reviewing court must presume that the factfinder resolved disputed facts in favor of its findings if a reasonable factfinder could do so. *Id.* The reviewing court disregards any evidence that a reasonable factfinder could have disbelieved but does not disregard undisputed facts. *Id.*

In reviewing the factual-sufficiency challenges to the jury's termination findings, we must give due consideration to evidence that the jury reasonably could have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002). The factual-sufficiency inquiry is whether the evidence is such that the jury reasonably could form a firm belief or conviction about the truth of the State's allegations. *Id.* This court should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction about the truth of the State's allegations, then the evidence is factually insufficient. *Id.* We must give due deference to a jury's factfindings, and we should not supplant the jury's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex.2006).

**4.** Unless otherwise specified, all statutory citations in this opinion are to the Texas Family Code.

In reviewing the no-evidence challenges to the jury's sole-managing-conservatorship findings, we must consider evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex.2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The jury is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

In reviewing the factual-sufficiency challenges to the jury's sole-managing-conservatorship findings, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). After considering and weighing all the evidence, we set aside the fact findings only if they are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986). The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. v. Pascouet,* 61 S.W.3d 599, 615–16 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Pascouet,* 61 S.W.3d at 616.

## III. ISSUES AND ANALYSIS

In one issue, Melissa argues the evidence is legally, or in the alternative factually, insufficient to support the following jury findings: (1) that she engaged in conduct or knowingly placed all of the children with persons who engaged in conduct that endangered the children's physical or emotional well-being; (2) that she knowingly placed or knowingly allowed all of the children to remain in conditions or surroundings that endangered their physical or emotional well-being; (3) that she failed to comply with provisions of a court order that specifically established the actions necessary for her to obtain the return of her children, who have been in the temporary managing conservatorship of the Department for not less than nine months as a result of their removal for abuse and neglect; (4) that termination of the parent-child relationship she shares with each of the children is in each child's best interest; and (5) that CPS should be appointed sole managing conservator of the children.

■ Johnny brings the same five challenges as to David, Amy, and Addy.[5] In addition, Johnny alleges that the trial court abused its discretion by excluding the testimony of Sherri Simmons, his designated expert on adoption and sibling issues. However, because Johnny failed to specifically present this issue to the trial court in a timely filed statement of appellate points or in such a statement combined with his motion for new trial, Johnny has waived this issue. *See* TEX. FAM.CODE

---

5. Both parents' rights were terminated in the same trial, and the Department presented similar evidence in seeking to terminate each parent's rights. Therefore, we address the parents' respective issues together. When we refer to Johnny's parental rights, however, we refer to these rights only as to David, Amy, and Addy, the only children as to which he has rights.

ANN. § 263.405(b), (i) (Vernon Supp.2006) (barring an appellate court from considering any issue not specifically presented to the trial court in either a timely filed statement of points the party intends to appeal or such a statement combined with a motion for new trial). Accordingly, we overrule this issue.

## A. Is the evidence legally and factually sufficient to support termination under 161.001(1)(O)?

 Paragraph (O) of subsection 161.001(1) provides that one basis for establishing the parental-conduct prong required for termination of parental rights is that a parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." TEX. FAM.CODE ANN. § 161.001(1)(O) (Vernon Supp.2006).

There is no dispute that at the time of trial the children had been in the temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from Johnny and Melissa under Chapter 262 for abuse or neglect.[6] Furthermore, the evidence shows, and Johnny and Melissa do not dispute, that the trial court signed an order, in which the trial court ordered Johnny and Melissa to take the following specific actions that the trial court stated were necessary for them to obtain the return of the children:

(1) submit to and cooperate fully in the preparation of a psychological assessment ... with a psychologist designated by [CPS], and follow all recommendations of the psychologist with regard to further assessment or treatment, including but not limited to psychiatric evaluation and treatment.

(2) attend, actively participate in, and successfully complete parenting classes with a provider designated by [CPS] and to submit to [CPS] a certificate of completion for the same.

(3) attend, actively participate in, and successfully complete counseling with a therapist designated by [CPS] to address the specific issues that led to the removal of the subject children from the home and to address any additional issues arising during the pendency of this case, and follow any and all recommendations of the therapist.

(4) submit to and successfully complete a drug and alcohol abuse assessment at Gulf Coast Center or another treatment facility designated by [CPS], and follow all recommendations made by facility staff with regard to further assessment or treatment, whether said recommendation be for inpatient or outpatient treatment.

(5) remain drug and alcohol free during the pendency of this suit ... and submit to random drug/alcohol screenings as directed by [CPS] ...

(6) maintain a safe and stable home environment, and

(7) comply with each requirement set out in the original, or any amended, service plan filed with the Court dur-

---

**6.** In any event, there is legally and factually sufficient evidence in the record to support such a finding.

ing the pendency of this suit by [CPS]. . . .

Testifying during the Department's case-in-chief, Johnny admitted that he did not complete the counseling ordered in item (3), above. Johnny also testified that he had not complied with the court's order in item (6) to maintain a safe and stable home environment. Johnny testified that his current home is not a safe and stable environment for the children. Johnny also admitted that he had not complied with each requirement set out in his service plan as ordered by the trial court in item (7). Explaining that his job allows him to not work on any given day if he has something he needs to do, Johnny testified there is no reason why he could not have taken off work to finish his counseling, to maintain his home, and to take care of his responsibilities with CPS.

Likewise, Melissa, testifying during the Department's case-in-chief, admitted that she did not follow all recommendations of her psychologist as required in item (1). Melissa admitted that she did not successfully complete counseling with her therapist as required in item (3). Additionally, Melissa testified that she had not complied with the court's order in item (6) to maintain a safe and stable home environment for her children. Melissa also admitted that she had not complied with each requirement set out in her service plan as ordered by the trial court in item (7). Johnny also testified that he was aware that Melissa was not undergoing the therapy and completing the counseling ordered by the trial court.

CPS referred Johnny and Melissa to therapist Provilla Scruggs for their counseling as required by item (3) above. Scruggs testified that Melissa did not successfully complete counseling as ordered by the trial court. Scruggs also stated that Melissa did not even make substantial progress in successfully completing this counseling. Scruggs listed seven treatment goals that Melissa and she had developed for Melissa's counseling. Scruggs testified that Melissa had achieved only one of these goals. Though Melissa had made some progress on two of the goals, she had not achieved the remaining four goals. Scruggs testified that she had eleven counseling sessions with Melissa between July and December of 2005. Melissa failed to appear for a counseling appointment on December 1, 2005, and after her counseling session on December 22, 2005, Melissa never again appeared for further sessions to complete her counseling. Scruggs called Melissa a few times and saw her once in the CPS parking lot. Melissa called in April 2006, and Scruggs made an appointment for counseling; however, Melissa later canceled, saying she had car trouble.

Scruggs first saw Johnny in September 2005, after he was released from jail. Scruggs removed Johnny from her schedule after he failed to appear for two sessions, and she testified that she had not seen him since January 2006. According to Scruggs, she provided Johnny and Melissa many chances to complete their court-ordered counseling, yet they failed to do so.

Carolyn Davis, Johnny and Melissa's CPS caseworker also testified as follows:

- Melissa completed her court-ordered services to a degree. In the fall of 2005, Melissa completed everything and was "going to everything aggressively." However, in early 2006, legal problems got in the way, and Melissa dropped out of the counseling.

- To Davis's knowledge, Melissa followed the recommendations of her psychologist.

- To Davis's knowledge, Melissa had not been taking her medications for her bipolar disorder.
- Johnny and Melissa have not maintained a safe and stable home as ordered by the trial court.
- When asked whether Johnny had completed his court-ordered services, Davis answered "yes" and stated that Johnny had done the psychological assessment, the drug assessment, parenting classes, and the counseling until "legal problems got in the way and he dropped out." However, she also testified that Johnny had not completed the court-ordered services because he did not complete the counseling.
- Davis believes that Johnny and Melissa have substantially completed their court-ordered services.
- Johnny and Melissa were told multiple times that they needed to complete their court-ordered services and comply with the trial court's orders within one year of the children coming into CPS's care.
- Johnny and Melissa failed to comply with the provisions of the trial court's order establishing what was necessary for the children to be returned to their home.
- Davis no longer believes that Johnny and Melissa substantially completed the court-ordered services. They were "over 51 percent," but they were not substantially complying.

Johnny and Melissa assert in their issues that there is legally and factually insufficient evidence to support the jury's finding that they "failed to comply with the provisions of a court order that specifically established the actions necessary for

[them] to obtain the return of the children." However, Johnny and Melissa do not explain how there is no evidence that they failed to comply with the trial court's order. This is not surprising because Johnny testified that he failed to comply with three of the seven items in the court's order, and Melissa testified that she had failed to comply with four of the seven items.

Instead, in their appellate briefing, Johnny and Melissa focus on the parts of Davis's testimony in which she stated that Johnny and Melissa had substantially completed the requirements ordered by the court. This argument raises the issue as to whether substantial completion is sufficient to avoid a termination finding under section 161.001(1)(O). Johnny and Melissa assert that, because this court must strictly construe termination statutes in favor of the parents, we should construe section 161.001(1)(O) as requiring only substantial compliance with or completion of the trial court's order. Johnny and Melissa have not cited, and this court has not found, any cases holding that substantial completion or substantial compliance is sufficient to avoid a finding under section 161.001(1)(O).[7] Research reveals that substantial completion or substantial compliance is not enough to avoid a termination finding under this section. *See In re T.N.F.*, 205 S.W.3d 625, 630–31 (Tex.App.-Waco 2006, pet. denied) (indicating the parents must comply with every requirement of the court order and holding that section 161.001(1)(O) does not allow for consideration of excuses as to why parents failed to comply with all provisions of the court's order); *In re D.L.H.*, No. 04–04–00876–CV, 2005 WL 2989329, at *2 (Tex. App.-San Antonio Nov.9, 2005, no pet.)

---

7. Johnny cites no cases in this regard, and the only case Melissa cites is not on point because it does not involve termination based on section 161.001(1)(O). *See Doria v. Texas Dep't Human Res.*, 747 S.W.2d 953, 958 (Tex.App.-Corpus Christi 1988, no writ).

(mem.op.) (rejecting parents' arguments that substantial compliance is sufficient to avoid a finding under section 161.001(1)(O)); *see also In re J.R.*, No. 14–01–01042–CV, 2002 WL 31318790, at *8 (Tex.App.-Houston [14th Dist.] Oct. 17, 2002, no pet.) (not designated for publication) (stating that section 161.001(1)(O) requires the parent in question to comply with all of the terms of the court's order).

Nevertheless, we need not address whether substantial completion or substantial compliance may be sufficient to avoid a finding under section 161.001(1)(O) because, presuming without deciding that it is sufficient, the evidence is still legally and factually sufficient to support the jury's findings under section 161.001(1)(O). In part of her testimony, Davis initially indicated that Johnny had completed his court-ordered services and that Johnny and Melissa had substantially completed their court-ordered services. However, Davis retracted this testimony, later testifying that Johnny and Melissa failed to substantially comply with the trial court's order. We conclude the jury reasonably could have credited the parts of Davis's testimony supporting a conclusion that Johnny and Melissa did not substantially comply with the court order or substantially complete the actions ordered by the trial court. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex.2005) (stating that, in reviewing sufficiency of the evidence in cases involving "clear and convincing" burden of proof, appellate courts must defer to the jury's credibility determinations, at least as long as they are not unreasonable). Furthermore, Stephanie Sammons, Davis's supervisor at CPS, testified as to her belief that Johnny and Melissa had not substantially complied with their court-ordered services and other requirements necessary for the children to be returned. Likewise, the testimony of Scruggs, Johnny, and Melissa also support the conclusion that

Johnny and Melissa did not substantially complete their court-ordered services or substantially comply with the trial court's order specifically establishing the actions necessary for the children to be returned.

Reviewing all the evidence in the light most favorable to the termination findings, we conclude that a reasonable factfinder could have formed a firm belief or conviction as to the truth of the termination findings under section 161.001(1)(O). *See In re T.N.F.*, 205 S.W.3d at 630–31 (holding evidence was legally and factually sufficient to support termination of father's parental rights under section 161.001(1)(O) based on his failure to comply with all twelve of the specific actions listed in the trial court's order); *In re D.L.H.*, 2005 WL 2989329, at *2 (holding evidence was legally and factually sufficient to support termination of parents' rights under section 161.001(1)(O) based on their failure to fully comply with only two items in the trial court's order); *In re J.M.M.*, 80 S.W.3d 232, 244 (Tex.App.-Fort Worth 2002, pet. denied) (concluding that, even presuming that substantial compliance could be sufficient to avoid termination under section 161.001(1)(O), evidence was legally and factually sufficient to support termination of mother's parental rights under this section), *disapproved on other grounds by, In re J.F.C.*, 96 S.W.3d 256, 267 (Tex.2002).

In light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the termination findings under section 161.001(1)(O) is not so significant that a factfinder could not reasonably have formed a firm belief or conviction as to the truth of these findings. *See In re J.F.C.*, 96 S.W.3d at 266. Giving due consideration to the evidence the jury reasonably could have found to be clear and convincing, we conclude the jury reasonably could form a firm belief or conviction about the

truth of the termination findings under section 161.001(1)(O). *See In re T.N.F.*, 205 S.W.3d at 630–31; *In re D.L.H.*, 2005 WL 2989329, at *2; *In re J.M.M.*, 80 S.W.3d at 244. Accordingly, we overrule Melissa's third sub-issue and Johnny's third issue, both of which challenge the sufficiency of the evidence to support the jury's findings under section 161.001(1)(O).[8]

**B. Is the evidence legally and factually sufficient to support the findings that termination is in the best interests of the children?**

■ In Melissa's fourth sub-issue and Johnny's fourth issue, they assert the evidence is legally and factually insufficient to support the jury's findings that termination of their parental rights is in the best interests of each of the children. The jury was instructed that some factors that may be considered in making this determination are (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) any emotional and physical danger to the child now and in the future; (4) the parenting ability of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976). "Best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *Id.*

CPS caseworker Carolyn Davis testified that the children usually had to be reminded to hug their parents at the end of their visits. She also stated that during the visits she did not see much of a bond between Melissa and her children. Davis testified that when the children went into foster care, they were "behind in their development." However, since being in foster care, they all had improved significantly. The children were described as happy and secure in their foster placements, with all of them being in stable foster homes for several months. Davis stated that, in her opinion as a caseworker, adoption is in the best interest of these five children, which necessarily requires termination of Johnny's and Melissa's parental rights. Davis stated that CPS's goal for the five children is adoption. The three youngest children are currently placed with foster parents who would like to adopt them. David is with one set of foster parents who would like to adopt him, and Amy and Addy are with another set of foster parents who would like to adopt them. Davis stated that it would be in their best interests for Amy, Addy, and David to be adopted together but that there is no guarantee of such an outcome. Davis also stated that the younger children's half-siblings, Tommy and Adrienne are currently in separate foster homes.

Pauline Clansy, the psychologist who performed the psychological evaluations on Johnny and Melissa, testified that Johnny would be able to parent, given adequate support. She agreed that, hypothetically, if Johnny had substantially complied with his individual therapy and if he had successfully completed the parenting classes, he would be able to parent the five children. However, she did not reach the same conclusion as to Melissa's prospects

8. Having done so, we need not address Melissa's first and second sub-issues and Johnny's first and second issues challenging the jury's findings under section 161.001(1)(D) and (E).

for successful parenting. Dr. Clansy stated that Melissa has difficulty with change and problems planning and following through with activities, which make parenting a challenge. According to Dr. Clansy's reports, both Johnny and Melissa suffer from some degree of bipolar disorder.

Provilla Scruggs, the CPS-provided therapist, stated that both Johnny and Melissa would have difficulty making the changes necessary for them to succeed as parents. Scruggs testified that she had concerns about Melissa's ability to make appropriate choices and parental judgments, as well as her ability to take responsibility for the care of her five children. Scruggs stated she does not think Johnny and Melissa could provide a safe and stable home environment for their children at this time. According to Scruggs, Melissa could not provide Johnny with the stability and support he needs to even parent three of the five children. Scruggs testified that part of Melissa's problem is that she has not been taking medication for her biploar disorder. Scruggs stated that, even if Melissa takes medications to address her bipolar disorder and depression, these medications may not remedy Melissa's difficulty making good choices or solve her various problems with insight, consistency in parenting, cleanliness of her house, and taking responsibility.

A former neighbor of Johnny and Melissa testified that, around 3:00 a.m., she saw four-year-old Adrienne coming down the stairs from her apartment by herself. The neighbor took Adrienne back upstairs and woke up Johnny and Melissa. According to the neighbor, Melissa was not surprised and stated that "[Adrienne] does that all the time." The neighbor testified that this incident occurred before David fell out of the window and was not the incident with Adrienne in which CPS was called.

Johnny testified to several time periods during the children's lives in which he would be living apart from Melissa and the children for two to six months to give Melissa and Johnny time to "cool off." Johnny admitted these separations would contribute to a chaotic and unstable environment for the children. Addressing his criminal record, Johnny testified that he was on probation in three different counties for theft-by-check and that, as of trial, Johnny was not in compliance with his probation requirements in any of the three counties. Johnny acknowledged that, if the trial court in any one of these counties found that he had violated his probation, he could be incarcerated for as long as one year. Johnny stated that, since he married Melissa, he has been incarcerated five or six times, and Melissa has been incarcerated three times.

Johnny also admitted that he had a webpage on "myspace.com," which included a photograph of Johnny and a statement that he was single. This webpage also contained the statement, "I don't want kids." Although Johnny acknowledged this was his webpage, he claimed not to know about the contents of the webpage and stated that he emailed the photograph of himself to Tim Shank, who then set up the webpage. Johnny testified that this webpage was created less than two weeks before trial and that if called to testify, Tim Shank would take responsibility for setting up the webpage. The next day, Tim Shank testified he did not set up and knew nothing about any webpage that Johnny had on "myspace.com." Melissa testified that Johnny had been unfaithful to her while she was pregnant with their twin daughters. There was sufficient evidence for the jury reasonably to conclude that Johnny set up the webpage, which

stated he was single and did not want children.

At the time of trial, Melissa was incarcerated in the Brazoria County Jail and anticipated being in jail for another eight weeks. Melissa stated that she was not in compliance with the terms of her probation in another county and, for that reason, could be jailed for another six months in that county. Melissa testified that she was surprised to learn about her husband's webpage but that it did not upset her. When asked why the webpage did not upset her, she said that she did not know. Melissa testified that, if the children are returned, then Johnny and she plan on getting a bigger home, making it safe, and giving the children everything they need mentally and physically.

Moreover, Johnny's and Melissa's failure to complete the court-ordered therapy with Scruggs militates in favor of the jury's finding, even though they both provided excuses for this failure. Johnny agreed at trial that he had not maintained a safe and stable home environment. Johnny testified that he had not given his children the love and discipline they require to satisfy their emotional needs. Johnny testified that if the children were returned to Johnny and Melissa and both parents were incarcerated, they would arrange for a relative, Hattie Williams to care for the children. Williams is the seventy-two-year-old great-grandmother of the children's cousin. Johnny stated that, if he were incarcerated, he could not help support his children, but that Williams has support from churches and the surrounding communities.

The twins' foster mother testified that she and her husband had been caring for the girls since June 8, 2005, and that they would like to adopt Amy and Addy. She stated that when the twins first arrived they were full of head lice and talked a lot but not in a way that the foster parents understood. They would not answer to their names but they indicated that their names were "Noony" and "Ms. Piggy." Their foster mother stated that testing indicated that Amy and Addy were one year behind in their development; however, she said they have been improving in foster care.

David's foster mother testified that David has been living with her husband and her since August 2005. She testified that when they began to care for him, David had very bad speech problems and difficulty with boundaries and discipline. David now sees a speech therapist twice a week and has progressed quite a bit. She and her husband would like to adopt David. She also testified that she knows a foster family that has expressed a strong interest in adopting Tommy and Adrienne. If these three sets of foster parents adopt the five children, then all of the adoptive parents would know one another, which would make it possible for the children to have contact with one another in the future.

In her case-in-chief, Melissa testified that, if the children are returned, she plans to move to a three-bedroom apartment in a complex in which they previously lived. She intends to continue the speech therapy the children are currently receiving in foster care. She said she would see a doctor for her bipolar disorder and take the medications that he prescribed. She also stated that she would get a job at a fast-food restaurant and have Hattie Williams babysit for the children while she was at work.

In his case-in-chief, Johnny testified that, if the children are returned, he plans on moving into a three-bedroom apartment and seeing if the children can continue to address their developmental delays through the services they are currently receiving while in foster care.

Stephanie Sammons, Davis's supervisor at CPS, testified that she believes it is in the children's best interest that Johnny's and Melissa's parental rights be terminated. Sammons also stated that she does not feel it is in the children's best interest to be separated from their brothers and sisters or to be placed in foster homes in which they potentially could bond again and then have that bond broken. Sammons testified that preserving the bond between brothers and sisters is essential to their long-term emotional well-being. Sammons explained that it is in the best interest of the children that, if their natural parents' parental rights are terminated, the children should be placed, if possible, with an appropriate relative or close family friend who has had a significant relationship with the children. Sammons testified that, if Johnny's and Melissa' parental rights are terminated, CPS would look first for an adoptive placement in which all five children could stay together. If CPS could not find such a placement, then, according to Sammons, CPS would see if there are adoptive placements available for multiple children to maintain contact between the siblings. Sammons stated that, if the five children could not be adopted in a single placement, then CPS would determine what other adoptive placements should be pursued, including potential adoption by the foster parents with whom the children are currently placed. Sammons stated that she had never seen an instance of five children being adopted in one home, although she could not remember ever trying to place five children together. Sammons stated that she was somewhat confident that all five children could be placed together.

Reviewing all the evidence in the light most favorable to the termination findings, we conclude that a reasonable factfinder could have formed a firm belief or conviction as to the truth of the jury's findings that termination of Johnny's and Melissa's parental rights is in the best interests of the children. *See Smith v. Texas Dep't of Prot. & Reg. Servs.*, 160 S.W.3d 673, 680–83 (Tex.App.-Austin 2005, no pet.) (concluding evidence is legally sufficient to support best-interest finding). In light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the jury's best-interest findings is not so significant that a factfinder could not reasonably have formed a firm belief or conviction as to the truth of these findings. *See In re J.F.C.*, 96 S.W.3d at 266. Giving due consideration to the evidence the jury reasonably could have found to be clear and convincing, we conclude that the evidence is such that the jury reasonably could form a firm belief or conviction about the truth of its findings that termination of Johnny's and Melissa's parental rights is in the best interests of the children. *See Smith*, 160 S.W.3d at 680–83 (concluding evidence is factually sufficient to support best-interest finding); *In re V.A.*, No. 13–06–237–CV, 2007 WL 293023, at *5–7 (Tex.App.-Corpus Christi Feb.1, 2007, no pet. h.) (mem.op.) (concluding evidence is factually sufficient to support best-interest findings). Accordingly we overrule Melissa's fourth sub-issue and Johnny's fourth issue.[9]

9. Johnny and Melissa cite four cases in which courts have concluded the evidence is legally or factually insufficient to support best-interest findings; however, these cases are factually distinguishable and not on point. *See In re C.T.E.*, 95 S.W.3d 462, 467–69 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (holding evidence was factually insufficient to support best-interest finding because (1) the children had behavioral problems and special needs and there was no evidence that they were adoptable or what the chances were that they would be adopted by the same family, (2) one child had been in nine different foster

## C. Is the evidence legally and factually sufficient to support the jury's findings that CPS rather than the children's relative should be the sole managing conservator of the children?

■ In Melissa's fifth sub-issue and in Johnny's fifth and sixth issues, they argue the evidence is legally and factually insufficient to support the jury's finding, by a preponderance of the evidence, that CPS, rather than Hattie Williams, should be appointed sole managing conservator of the children. In analyzing these issues, we apply the familiar standard of review for legal and factual sufficiency in civil cases in which the burden of proof at trial was by a preponderance of the evidence. *See Corrales v. Dep't of Family and Prot. Servs.*, 155 S.W.3d 478, 487–88 (Tex.App.-El Paso 2004, no pet.).

Hattie Williams is a distant relative of the children who has cared for them in the past. Melissa testified that Williams is between seventy and eighty years old. According to Melissa, Williams was recently married and has "a lot on her plate." Although she acknowledged that rearing five young children is a huge responsibility, Melissa thinks it is realistic for Williams to care for the five children, all of whom have some special needs. Johnny and Melissa each stated they have no concerns with the children being placed with Williams on a long-term basis. Melissa testified that, if Johnny and she could not keep the children, then it would be in each child's best interest to live with Williams.

CPS caseworker Carolyn Davis testified that there are too many concerns about placing the children with Williams. She explained that Williams told her that she did not think she could follow the rules regarding visitation and parent access to the children. Davis also stated that she had concerns based on Williams's advanced age and the fact that the children are very active, requiring a great deal of care. Davis noted that Williams recently married and that she already is caring for two of her great-grandchildren, who live in her home.

Hattie Williams testified that she is seventy-two years old and in very good health. She knows, loves, and has a bond with the five children. She stated she and her husband would be willing to take the children on a long-term basis if Johnny's and Melissa's parental rights are terminated. Williams admitted telling caseworker Davis that Williams would have trouble following instructions or the court order but said that, since then, she has talked to Davis, Johnny, and Melissa, and now would be willing to follow the instructions of CPS and the court. Williams, who has one daughter, three grandchildren, and four great-grandchildren, has raised her own child as well as five siblings, a niece, a nephew, and a child who was entrusted to her for seven years by the child's parents. Williams currently has two great-grandchildren living with her during the week,

homes and the other in six different foster homes, and (3) there was evidence one child was sexually abused while in CPS's care); *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 579–80 (Tex.App.-Corpus Christi 1993, no writ) (concluding evidence was factually insufficient to support best-interest finding after finding insufficient evidence to support parental-conduct finding and in case where one of petitioner's social workers testi-fied that termination of parental rights was not in children's best interest); *Doria*, 747 S.W.2d at 958 (finding evidence factually insufficient based on parental-conduct finding); *In re A.L.F.*, 690 S.W.2d 106, 107 (Tex.App.-Beaumont 1985, no writ) (finding evidence legally insufficient in short opinion that does not discuss evidence relating to best-interest finding).

and they are three and four years old. Williams said she could take care of seven children at once.

Stephanie Sammons, Davis's supervisor at CPS, testified that she had issues with the children being placed with Williams because Williams already had two great grandchildren living with her that she cared for on a fairly permanent basis. Furthermore, Davis stated that Williams had informed Davis that she could not follow the rules of the court regarding visitation and maintaining contact between children and parents. Sammons stated that, even if Williams were willing to follow these rules, Sammons would have concerns about Williams's ability to properly manage all five children in the home on a long-term basis. Under the applicable standards of review, we conclude the evidence is legally and factually sufficient to support the jury's finding that CPS, rather than Williams, should be appointed sole managing conservator of the children. *See Corrales,* 155 S.W.3d at 489–91 (concluding that the evidence was legally and factually sufficient to support the jury's finding that CPS rather than the children's grandmother should be appointed sole managing conservator upon termination of the parents' parental rights). Accordingly we overrule Melissa's fifth sub-issue and Johnny's fifth and sixth issues.

## IV. Conclusion

The evidence is legally and factually sufficient to support the jury's findings regarding the parental-conduct prong under section 161.001(1)(O) and the best-interest prong. Likewise, the evidence is legally and factually sufficient to support the jury's findings that CPS, rather than Hattie Williams, should be appointed sole managing conservator of the children. Ac-

cordingly, we affirm the trial court's judgment.