# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-05-00244-CV

**Ramona Harris, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

**FROM THE DISTRICT COURT OF HAYS COUNTY, 207TH JUDICIAL DISTRICT
NO. 00-0684-A, HONORABLE DONALD V. HAMMOND, JUDGE PRESIDING**

### O P I N I O N

Appellant Ramona Harris gave birth to C.C.H. on February 3, 2001. The Texas Department of Family and Protective Services first got involved with Harris in late 1999 and removed her three older children from her care in 2000. When C.C.H. was born, the Department immediately took custody of him and placed him in foster care with his older siblings.[1] The cause was submitted to a jury in October 2004, and the jury returned a verdict finding that Harris's parental

---

[1] Harris's parental rights to her older children were terminated in an earlier proceeding. *See Harris v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-01-00643-CV, 2003 Tex. App. LEXIS 2842, at *1 (Tex. App.—Austin Apr. 3, 2003, no pet.) (memo. op.). The Department first sought to terminate Harris's rights to C.C.H. in that proceeding but could not yet establish grounds for termination as to C.C.H. *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2006) (grounds for termination). The trial court's decree terminated Harris's rights to her older children and appointed the Department as C.C.H.'s managing conservator. The older children have been adopted by their foster parents, the same parents fostering C.C.H. Harris also has one younger child, N.H., who was removed from her care by the Department shortly before this trial but was not part of this proceeding.

rights to C.C.H. should not be terminated and that she should be named his managing conservator. The Department filed a motion for new trial, arguing that the jury's finding on conservatorship was against the great weight and preponderance of the evidence, manifestly unjust, and not in C.C.H.'s best interest. The child's attorney ad litem filed a motion asking the court to designate the Department as C.C.H.'s managing conservator.

Seven months later, in early April 2005, the trial court signed an order in accordance with the jury's finding that Harris's parental rights should not be terminated. However, the court went on to state that the jury's finding that Harris should be appointed managing conservator was "against the greater weight and degree of the credible evidence" and not in the child's best interest. The court named the Department as C.C.H.'s sole managing conservator and Harris as possessory conservator, with "supervised visitation . . . as has been in effect in the past." It is from this order that Harris appeals. She argues that the trial court erred in disregarding the jury's finding that she should be appointed C.C.H.'s managing conservator. She further argues that the trial court's judgment (1) did not make the findings necessary to name the Department as C.C.H.'s managing conservator, (2) granted relief not requested by the Department, and (3) did not grant relief that was in the child's best interest. We reverse the trial court's order.

**Which statutes apply?**

The cause before us involves the interaction of several sections of chapter 5 of the family code, including sections 105.002, 161.205, and 263.404. We must therefore determine how these statutes should be interpreted and applied and whether they can coexist or are in conflict. Harris argues that section 105.002 of the family code prohibited the trial court from disregarding the

2

jury's finding as to conservatorship. *See* Tex. Fam. Code Ann. § 105.002 (West Supp. 2006). The Department, on the other hand, argues that the trial court did not err in entering its order, relying on section 161.205 of the family code, which it argues is a more specific statute that should control over section 105.002. *See id*. § 161.205 (West 2002).

Section 105.002 provides that in most suits affecting a parent-child relationship, (1) a party is entitled to a jury trial, and (2) the trial court may not contravene the jury's verdict on the appointment of managing or possessory conservators. *Id*. § 105.002(a), (c). In determining issues of conservatorship and possession of a child, the child's best interest must be the trial court's primary consideration. *See id*. § 153.002 (West 2002). There is a strong presumption that a parent should be appointed managing conservator unless that appointment is not in the child's best interest and would significantly impair the child's physical health or emotional development. *Id*. § 153.131(a) (West 2002); *Lewelling v. Lewelling*, 796 S.W.2d 164, 166-67 (Tex. 1990). Under chapter 161, which governs suits seeking to terminate a parent's relationship with her child, *see* Tex. Fam. Code. Ann. §§ 161.001-.211 (West 2002 & Supp. 2006), if a trial court does not terminate a parent's rights, it shall either deny the petition or "render any order in the best interest of the child." *Id*. § 161.205. The Department contends that section 161.205 authorized the trial court to disregard the jury's findings as to conservatorship and appoint the Department as managing conservator. We disagree.

When a child has been taken into the Department's care, the trial court must conduct periodic hearings to review conservatorship and a parent's attempts to regain custody of her child. *See id*. §§ 263.001-.503 (West 2002 & Supp. 2006). Under chapter 263, a trial court must render

3

a final order within eighteen months of the Department's appointment as temporary managing conservator.[2]  *Id*. § 263.401(a), (b) (West Supp. 2006).  A final order is one that orders the child returned to the parent, terminates the parent-child relationship, names a relative or other person as the child's managing conservator, or appoints the Department managing conservator without terminating the parent's rights.  *Id*. § 263.401(d).  Section 263.404 allows a trial court to render a final order that does not terminate a parent's rights yet names the Department as managing conservator if the court finds (1) that the appointment of the parent as managing conservator would not be in the child's best interest because it would significantly impair the child's physical or emotional well-being and (2) that it is not in the child's best interest to appoint a relative or another person as the child's managing conservator.  *Id*. § 263.404(a) (West 2002).  In making that decision, the trial court should consider the child's age, needs, and desires, whether a child twelve or older has expressed strong feelings against termination or being adopted, and any special needs that would reduce the child's chances of being adopted.  *Id*. § 263.404(b).

In construing a statute, we look to the legislature's intent, first examining the plain language used.  *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002).  The legislature enacted section 105.002 as part of subtitle A, "General Provisions," which governs all suits affecting the parent-child relationship.  Contrary to the Department's contention, Texas courts have considered section 105.002 in several contexts, including termination, and have applied it in conjunction with statutes governing

---

[2]  An earlier trial on the termination of Harris's rights to C.C.H. ended in a mistrial, and as a result, these proceedings extended past the eighteen-month deadline for a termination suit.  *See* Tex. Fam. Code Ann. § 263.401 (West Supp. 2006).  Shortly before trial, Harris filed a motion to dismiss the termination suit for lack of jurisdiction "as provided for by Chapter 263 of the Texas Family Code."  The trial court denied the motion, and Harris does not discuss this issue on appeal.

4

termination suits. *See Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 653-54 (Tex. App.—Austin 2005, pet. denied) (section 105.002 applied in suit in which parents' rights were terminated and grandmother sought conservatorship); *Corrales v. Department of Family & Protective Servs.*, 155 S.W.3d 478, 488 (Tex. App.—El Paso 2004, no pet.) (section 161.207, which requires appointment of managing conservator after parental rights are terminated, "must be read in conjunction with Section 105.002," and court "may not contravene a jury verdict concerning the appointment of a sole managing conservator"); *In re Rodriguez*, 940 S.W.2d 265, 271 (Tex. App.—San Antonio 1997, writ denied) (applying section 105.002 in suit asking whether father or guardian should be appointed managing conservator); *see also Lenz*, 79 S.W.3d at 13, 19-20 (applying section 105.002 to order imposing geographical limitation on children's residence).

The jury found, and the trial court entered judgment in conformity with that finding, that Harris's parental rights to C.C.H. should not be terminated. Once that decision was made, the only issue that remained was who should be named as managing conservator of C.C.H. A trial court that does not terminate a parent's rights in a termination suit must either dismiss the petition or enter an order in the child's best interest. Tex. Fam. Code Ann. § 161.205. In making its orders, the trial court may not contravene the jury's determination of conservatorship unless the jury's findings are not supported by the evidence. *Lenz*, 79 S.W.3d at 20 ("because we have concluded that there is legally sufficient evidence to support the jury's verdict in this case, we further conclude that the trial court improperly contravened the jury's verdict by imposing a geographical restriction on the boys' primary residence"); *Taylor*, 160 S.W.3d at 653-54; *Rodriguez*, 940 S.W.2d at 271; *see also Corrales*, 155 S.W.3d at 488 (court may not contravene jury verdict on sole managing conservator,

5

and conservatorship decision is reviewed not for abuse of discretion but under traditional sufficiency standards); *In re W.H.M.*, No. 01-00-01396-CV, 2003 Tex. App. LEXIS 8548, at *19-23 (Tex. App.—Houston [1st Dist.] Oct. 2, 2003, pet. denied) (mem. op.) (holding that "jury's findings regarding . . . managing or possessory conservatorship had to be supported by a preponderance of the evidence," citing family code section 105.005, and noting that jury's custody determination is binding on trial court if supported by evidence); *Brunson v. Brunson*, 502 S.W.2d 578, 579 (Tex. Civ. App.—Fort Worth 1973, no writ) (applying predecessor to section 105.002 and holding that "in order for the jury verdict to be binding upon the court it must be supported by evidence of probative force"). We must conduct a traditional sufficiency review to determine whether the trial court erred in contravening the jury's conservatorship determination. *See Lenz*, 79 S.W.3d at 19-20; *Brunson*, 502 S.W.2d at 579-80.

Harris is attacking the trial court's disregard of a jury's finding in her favor on an issue on which the Department had the burden of proof. *See In re W.G.W.*, 812 S.W.2d 409, 413 (Tex. App.—Houston [1st Dist.] 1991, no writ) (party seeking to bar natural parent from appointment as managing conservator must show that child's best interest "would be best served by the appointment of a non-parent"). Therefore, we ask whether there was legally sufficient evidence to support the jury's finding; if there was legally sufficient evidence, the trial court erred in contravening the jury's finding. *See Lenz*, 79 S.W.3d at 19-20; *Brunson*, 502 S.W.2d at 579; *see also John Paul Mitchell Sys. v. Randall's Food Markets, Inc.*, 17 S.W.3d 721, 728 (Tex. App.—Austin 2000, pet. denied) ("We will uphold a trial court's judgment notwithstanding the verdict only if we determine that there is no evidence to support the jury's findings."). We view

6

the evidence in the light most favorable to the jury's finding, indulging every reasonable inference that supports the finding, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 821-22 (Tex. 2005). If reasonable jurors could differ in their conclusions, we may not substitute our judgment for the jury's, and we must defer to the jury's determinations of the credibility of the witnesses, the weight to be given the testimony, and the resolution of evidentiary conflicts. *Id*. at 819-20, 822. In other words, the trial court could have contravened the verdict only if a reasonable fact-finder *could not* have resolved the factual disputes in favor of the verdict. *See id*. at 823 ("Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise."). Finally, in conducting our review, we must keep in mind the rebuttable statutory presumption that it is in a child's best interest for his parent, rather than a non-parent, to be appointed managing conservator. Tex. Fam. Code Ann. § 153.131; *Lewelling*, 796 S.W.2d at 166-67.

### Sufficiency of the evidence supporting the jury's finding

C.C.H. was born on February 3, 2001. At the time he was born, the Department had been involved with Harris and her three older children through referrals dating back to late 1999. In mid-2000, the Department removed the three older children from Harris's care, and her parental rights to those children were terminated in October 2001. *See Harris v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-01-00643-CV, 2003 Tex. App. LEXIS 2842, at *1 (Tex. App.—Austin Apr. 3, 2003, no pet.) (memo. op.). C.C.H. was removed from Harris's care immediately after he

was born and placed in the same foster home as his older siblings. When Harris's rights to her older children were terminated, the Department was named temporary managing conservator; the trial court did not name Harris as his possessory conservator. Although Harris requested visitation several times, the Department denied her requests because she was not a possessory conservator.[3] At the time of trial in October 2004, Harris had been allowed to visit C.C.H. three times.

Most of the Department's evidence related to her behavior with her older children because the Department had removed C.C.H. from Harris's custody shortly after his birth and limited her contact with him during the pendency of this suit.[4] Harris was referred to the Department in 1999, when her older daughter made an outcry that she had been sexually abused by Harris's boyfriend. Harris initially disbelieved her daughter but later acknowledged the abuse. The boyfriend later pled guilty to the charge and was sentenced to prison. Although she agreed not to allow the boyfriend who abused her daughter to have contact with the children, Harris brought the children

---

[3] The dissent states that "[f]or reasons not in the record, Harris was generally denied visitation." This is incorrect. The record reflects that Harris had a few visits with C.C.H. before the termination trial related to the older children, but after that trial, the trial court entered a final order terminating Harris's rights to her older children and appointing the Department C.C.H.'s managing conservator. Because the order did not appoint Harris as possessory conservator, the Department refused to allow her visitation from that point on. Former Department caseworker Kellie Ragland testified to that effect, and the record includes a letter to Harris from Ragland dated October 21, 2002, in which Ragland stated that Harris was not entitled to visitation with C.C.H. and that visitation would be "disruptive to his schedule as well as his caregivers['] schedule" and "emotionally problematic" for him.

[4] The dissent seems to believe that by making this observation, we somehow are devaluing or disregarding the evidence related to Harris's interactions and treatment of her older children. This is not the case. We agree that Harris's conduct related to the older children is relevant in this cause. *See In re S.F.*, 32 S.W.3d 318, 322 (Tex. App.—San Antonio 2000, no pet.). We simply make this observation to place the evidence in context.

with her to prison to visit and possibly confront him about the abuse. In May 2000, another referral was made, alleging that Harris was frequenting a "crack house," exposing her children to that dangerous environment, spending time with another known sex offender, and allowing him contact with her children. The Department took custody of the three older children at this point and later proceeded to seek the termination of her parental rights.

At trial, Department caseworkers testified that in their dealings with her related to her older children, she was uncooperative and confrontational. The Department initially attempted to allow Harris visits with her older children twice a month, but caseworkers testified that Harris did not cooperate, sometimes refused to attend visitations unless all three children would be there, and once left a visit early because she believed her rights were being violated. However, Harris had also completed many of the court-ordered requirements, including two parenting classes, a drug and alcohol screening, and a psychological assessment, and attended Alcoholics Anonymous meetings. Caseworkers testified that Harris sometimes refused Department requests for drug testing, once tested positive for marihuana,[5] and admitted to smoking marihuana that one time; Harris and C.C.H. tested negative for illegal substances when C.C.H. was born. Caseworker Leslie Ontiveros testified that in May 2000, the police told her that Harris had gone to a "known crack house" and had brought her children to a house where a sex offender named Elvis Harris lived. Ontiveros believed that Elvis

---

[5] Caseworker Leslie Ontiveros testified that Harris tested positive for marihuana once, but Kellie Ragland testified that she "believed" Harris had tested positive two or three times. However, Ragland did not have any records to show more than one positive test, and she testified that she would not be surprised if Ontiveros testified that there was only one positive test. Harris denied any positive tests other than the one test after she admitted to smoking a marihuana cigarette shortly after she learned of her daughter's outcry and her three older children were removed.

9

Harris, who was deceased at the time of trial, was related to Harris's husband's family, although Harris, her husband, and her father-in-law denied this. Although Elvis Harris was characterized as a known sex offender, Ontiveros admitted that his conviction "may have" occurred after Harris's children were removed, and Harris introduced records showing that Elvis Harris was convicted in 2002, three years after the Department alleged endangerment because Harris had "exposed" her children to him and one year after her rights to her older children were terminated.

Scott Johnson, a San Marcos police detective, testified that he met Harris and her children in late 1999, after Harris's daughter made her outcry. He also dealt with Harris more recently, when the Department removed N.H. He said that he saw no signs that Harris had neglected or injured her children. He said that N.H. was clean and that Harris's house was "fairly well kept," although it looked like Harris was packing to move. Gayle Michalek, a licensed professional counselor who worked with Harris from August to December 2000, testified that Harris admitted to substance abuse starting in high school, but denied any recent use.[6] She also testified that Harris attended AA or NA meetings about three times a month.

Chris Farrell, another of Harris's therapists, met with her in February, March, and April 2001, starting very shortly after C.C.H. was born and removed from her care. Farrell testified that Harris told him that her mother was a drug addict when Harris was a child and that Harris had been in foster care when she was young. He testified that she was very angry, expressed violent

---

[6] Both Farrell and Michalek testified that Harris admitted to drug abuse in the past, but neither stated that she admitted to recent drug use. Michalek testified to the contrary, stating that Harris denied any recent drug abuse.

thoughts toward the Department, and believed she was being persecuted by the Department. During their sessions, Farrell attempted to point out that Harris's anger and attitude toward the Department were not helping her regain custody of her children. Farrell thought he was building rapport and making progress with Harris, but after six sessions, she got angry and left when he ran late with another client and never returned.

Farrell testified that Harris, who was working in a nursing home at the time, related a conversation she had with the daughter of a patient. The woman was angry and threatening, and Harris responded by reminding the woman "that her mother was in [Harris's] care." Farrell took this remark to mean that Harris was saying that "she could have hurt the woman's mother in retaliation for this woman calling [Harris] and threatening her." Harris then made what Farrell took to be similar threats towards Department caseworkers, saying they should hope never to be in a nursing home where Harris worked. Farrell said he was "shocked" to hear that level of anger and violence, saying that he was accustomed to clients being angry and venting about the Department with general remarks such as, "I'm so angry I could kill them." Farris, however, felt that Harris's remarks were very specific and showed him that Harris "was thinking in her mind about how she could hurt this woman's mother." Farrell believed Harris was "very angry" and violent, made poor choices for which she did not take responsibility, blamed others for her problems, and "retaliate[d] against others when they fail to conform to her wishes and desires." Farrell testified that during their fourth session he told Harris that he could be "subpoenaed to testify against her and use whatever confidential information she gave [him] against her."

11

Sherryl Boyd, the court-appointed special advocate for C.C.H., testified that he was happy and safe in his foster home with his siblings. She testified that he had not known any other home since his birth almost four years earlier. She also testified about some of the negative things the older children told her about living with Harris and said that the children told her that Harris was neglectful and violent and used drugs in front of them. C.C.H.'s foster mother, who with her husband has adopted the older three children, testified that C.C.H. was doing well in their home and was very attached to his oldest brother. She believed it was in his best interest to terminate Harris's rights so that he could be adopted into their family.

Cleiffort Cooks-Harris, Harris's estranged husband, denied that he or Harris used drugs or abused C.C.H. or N.H., their youngest son, and he felt that the Department was harassing him and Harris.[7] Cooks-Harris, who is African-American, testified that the Department got involved in his life only after he married Harris, who is Caucasian. At the time of trial, Cooks-Harris was in jail for violating Harris's protective order against him, which he thought had been removed, when

---

[7] The Department took custody of N.H. at some point, but the record is somewhat unclear as to exactly when that occurred. Caseworker Rodrigo Gonzales testified that the Department attempted to remove N.H. in 2002 but that the trial court found that the Department did not have grounds to remove the child. He also testified that in 2003 he responded to a report that N.H. had been slightly injured in a fight between Harris and Cooks-Harris (he was struck by a telephone cord when Cooks-Harris pulled the phone away from Harris), but that neglectful supervision referral was "ruled out" because Harris had taken N.H. and gone to a women's shelter and was properly protecting N.H. After that incident, Harris sent Gonzales a copy of the protective order she obtained against Cooks-Harris and a copy of a medical report showing that she brought N.H. to a doctor to be sure he was alright. The Department removed N.H. again three weeks before trial, presumably because Harris had allowed Cooks-Harris to babysit N.H. in Harris's home, in violation of the protective order. The record is unclear whether, at the time of trial, a termination action had been filed or whether N.H. was in the custody of Harris or the Department.

he took care of N.H. in Harris's home while Harris worked. The protective order provided Cooks-Harris with visitation rights to N.H. and allowed Cooks-Harris and Harris to agree to additional visitation. However, the order bars Cooks-Harris from entering Harris's home; visitation must take place at another location. Cooks-Harris testified that Elvis Harris was not a relative, that Elvis's brother was married to one of Cooks-Harris's cousins, and that he never knew Elvis had been convicted of a sex crime. Cooks-Harris's father testified that he did not think Harris or his son used drugs. He also testified that the alleged crack house was instead a relative's home and that he never knew that Elvis Harris was a sex offender.

Harris's mother, Karen Bryant, testified that Harris had attended AA and NA meetings, got an AA sponsor, and did not abuse drugs or alcohol. She denied many of the Department's allegations, including allegations that she herself was a drug addict. Bryant denied any drug use and testified that her mother, Harris's grand-mother, was an alcoholic and drug abuser and that Bryant herself was very opposed to drug use. She believed Harris was a good mother who tended to spoil her children but never neglected or abused them. She testified that she thought it was in C.C.H.'s best interest for him to be raised by Harris. Karen Rust, Harris's employer, testified that Harris had worked for her for more than two and one-half years, providing in-home care for elderly and disabled patients. She said that Harris was an excellent and professional care giver and that she had never received any complaints about Harris or reports that Harris had threatened a patient. Rust testified that Harris had described her dealings with the Department and told Rust that she thought the Department was "being overly aggressive and unfair." One of Harris's neighbors testified that

13

he never saw any evidence of drug use by Harris or Cooks-Harris or any signs that N.H. was abused or neglected.

Taylor Skaar, a domestic violence counselor at a women's shelter, testified that Harris used the shelter "as a place to get help." Skaar said Harris had the paperwork to initiate a divorce and talked about taking N.H. and moving to get away from both Cooks-Harris and the Department but was also conflicted about whether to reconcile with her husband and abandon the protective order against him. Skaar did not find Harris to be delusional or paranoid and said Harris was angry and believed she was being abused by the Department. Skaar thought Harris struggled with "being poor, not having money, not having a support system, and still being required to take care of her child and to earn money." Skaar heard similar complaints from other women about the Department's requirements. Skaar had never viewed Harris as violent and could not imagine her threatening to harm anyone. She had seen Harris angry but never aggressive or "explosively" angry. Skaar testified that Harris did not direct her anger at her children or Skaar, but instead at the Department and the situation in which she felt trapped. Skaar testified that she never saw any signs that N.H. was abused or neglected, saying, "One thing I know for sure is that Ramona really cares about her child."

Harris testified and denied most of the Department's charges leveled against her in this and the earlier termination proceeding.[8] She admitted that when her daughter made her outcry of abuse by Harris's former boyfriend, Harris initially doubted the accusation because she thought

_____

[8] The dissent states that Harris did not controvert the final order of termination related to her older children. However, Harris denied most of the Department's allegations and testified that she was not a drug addict, had not knowingly exposed her children to a sex offender, and had attempted to comply with the Department's reunification plan.

14

her daughter, who was not always honest and was a "daddy's girl," was trying to drive Harris back to her ex-husband. She later came to believe the outcry and recognized that bringing her children to see the abusive boyfriend in jail was a poor choice. She testified that although she learned later that her boyfriend was on probation for robbery, she did not know that at the time. Harris denied telling Farrell that her mother was a drug addict. She further denied using crack cocaine but admitted to smoking marihuana once shortly after her daughter's outcry and her children's removal. She denied bringing her children to a crack house and testified that the alleged crack house was actually the home of Cooks-Harris's uncle where the Harris family socialized, and she, Cooks-Harris, and Cooks-Harris's father testified that the uncle was neither a drug dealer nor user.[9] She denied threatening anyone and said that her remark to Farrell meant that she thought the Department staffers should "remember the golden rule" and should be nice to people because "one day they might need you, and you might treat them the same way that they're treating you." She also said that Farrell told her that "it was best for [her] to just quit and give [her] children away"; after that remark, she felt he was not working for or helping her. She denied refusing to visit her children and said she "might have been late for a visit." Harris had worked for the same care-giver agency for several years and made between $15,000 and $19,000 a year.

Harris testified that she attempted to vacate the protective order because she needed Cooks-Harris's help to babysit for N.H. She called the assistant district attorney who had helped her obtain the protective order and was told that the attorney "would look into it," which she thought

---

[9] Ragland testified that the Department did not do any investigation of whether the house was actually a "crack house" and that she did not know whether the police ever raided the house.

meant the protective order would be dropped. She stated that she obtained the protective order after a fight with Cooks-Harris, but denied alleging that he had physically abused her. She said she called the police out of anger but then realized that the Department would try to take N.H. away from her. She said she went to the shelter for safety from the State, not from Cooks-Harris. She said she had filed for divorce from Cooks-Harris and although "to a degree" she was "wanting to reconcile," she and Cooks-Harris both testified that they intended to go through with the divorce. Harris also denied that she had "subjected" her children to a known sex offender. She testified that in 1999, when she heard that Elvis Harris might be a sex offender, she went to the Sheriff's Office to inquire, and was told that he was not included in the sex offender registry. Harris introduced evidence showing that not until 2002, well after her inquiry, was Elvis Harris convicted of a sex offense.

In determining the placement of a child, the child's best interest is the primary consideration. Tex. Fam. Code Ann. § 153.002; *Doyle v. Doyle*, 955 S.W.2d 478, 479 (Tex. App.—Austin 1997, no pet.). In making that determination, the fact-finder is to consider the following factors: the child's desires, the child's present and future emotional and physical needs, emotional and physical danger posed to the child now and in the future, the parenting abilities of the individuals seeking custody, programs available to assist the would-be parents, the individuals' or agency's plans for the child, the stability of the proposed homes, any acts or omissions by the parent that might show an improper parent-child relationship, and any excuse for such acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).

Most of the Department's evidence related to Harris's behavior with her older children, and the jury could have determined that leaving C.C.H. in the Department's care would be

16

in C.C.H.'s best interests. However, the jury did not make that finding. Instead, it found that naming Harris as managing conservator would best serve the child's interests. That decision only needed to be, and was, supported by legally sufficient evidence.

It was not the trial court's role to re-weigh the evidence; the court was instead limited to ensuring that some credible evidence supported the jury's findings. *See* Tex. Fam. Code Ann. § 105.002(c)(1). Aside from stating that the jury's finding in favor of Harris was "against the greater weight and degree of the credible evidence," however, the trial court made no findings of fact and provided no details of the manner in which the jury's finding was unreasonable or unsupported by legally sufficient evidence. Nor did the court find that naming Harris as managing conservator would significantly impair C.C.H.'s physical or emotional well-being. *See id*. § 263.404(a)(1). Further, the trial court was not empowered to disregard the jury's verdict merely based on *factual sufficiency*; the court could only controvert the verdict if it found the verdict was not supported by *legally sufficient* evidence. *See* Tex. Fam. Code Ann. § 105.002(c); *Lenz*, 79 S.W.3d at 19-20. However, by its finding that the jury's verdict was "against the greater weight and degree of the credible evidence," the trial court made a finding that the verdict was against the preponderance of the evidence. *See, e.g.*, *Columbia Rio Grande Reg'l Healthcare, L.P. v. Hawley*, 188 S.W.3d 838, 864 n.4 (Tex. App.—Corpus Christi 2006, pet. filed) ("preponderance of the evidence" is defined in Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises, & Products* PJC 40.3 (2003), as "the greater weight and degree of credible evidence"). Thus, the trial court made it clear that it conducted a factual-sufficiency review, not a legal-sufficiency review. *See Long v. Long*, No. 08-05-00250-CV, 2007 Tex. App.

17

LEXIS 1111, at *6 (Tex. App.—El Paso Feb. 15, 2007, no pet. h.) (to establish error, wife "must challenge that the characterization is against the great weight and preponderance of the evidence [a factual sufficiency complaint] or that separate property status was established as a matter of law [a legal sufficiency complaint]"). This overstepped the trial court's proper role in reviewing the jury's verdict.

Harris has had stable employment for a significant period of time. She denied using crack cocaine, one of the allegations frequently leveled against her by the Department, had never tested positive for cocaine, and produced testimony by several witnesses that they had never seen her using cocaine or acting as if she were under the influence of an illegal drug. Harris produced testimony that when N.H. was in her care, he was well cared for and not neglected or abused. Although it is true that C.C.H. has been in his foster home since his birth and has not had visitation with Harris, it was the Department's decision to deny all visitation that resulted in the lack of contact between C.C.H. and his mother. There was no evidence of any improper behavior by Harris directed at or related to C.C.H., and Harris and her witnesses denied most of the Department's allegations related to her older children. It was for the jury, as sole judge of the credibility of the witnesses, to weigh the credibility, decide any evidentiary conflicts, and determine the weight to be given the evidence. *See City of Keller*, 168 S.W.3d at 819-20. When the jury examined the evidence, it was obligated to consider the rebuttable presumption that C.C.H.'s best interest would be served by allowing Harris, his natural parent, to raise him. *See* Tex. Fam. Code Ann. § 153.131; *Lewelling*, 796 S.W.2d at 167 ("It is no longer adequate to offer evidence that the nonparent would be a better

custodian of the child."). We cannot hold that the jury acted unreasonably in reaching its factual determinations. *See City of Keller*, 168 S.W.3d at 819-20, 822-23.

Certainly this is a difficult case with no easy answers. C.C.H. has been in a comfortable home with his siblings since birth. However, he has also been denied contact with his natural parent since October 2001, and this lack of contact is a result of Department decisions, not Harris's decisions or conduct since the October 2001 trial or any indifference on her part. *See Lewelling*, 796 S.W.2d at 168 n.9. We agree with the dissent that the evidence related to C.C.H.'s best interest "was sparse," but this is in part due to the Department's decision to deny Harris any contact with him since October 2001. Further, it was misconduct by Department witnesses that caused the first trial of this case to end in a mistrial, which has extended the delay in resolving this matter.[10] Harris may be difficult for the Department to work with but that cannot be grounds for cutting off contact between a child and his natural parent whose rights have not been terminated.

The dissent spends a great deal of time discussing the evidence that would support a finding of termination and the standards and statutes that apply to a finding of termination. However, in this case, the jury found and the trial court agreed that Harris's parental rights *should not be terminated*. We must ask only whether there was any evidence on which the jury could base its decision to award managing conservatorship to Harris, but instead, the dissent conducts a result-oriented inquiry, bending the standards of review in order to reach a decision more palatable to the

---

[10] The record reflects that during the first trial of this issue, one of the Department's witnesses broke rule 267 of the rules of civil procedure by talking to Department witnesses who had not yet testified. As a result, the trial court declared a mistrial.

19

dissent.[11] We may not act in such a result-oriented manner and instead must conform our inquiry to the standards set out in the family code and by the supreme court. We may not substitute our judgment for that of the jury on matters of evidentiary conflict and must apply the law the same in this case as we would in any other.

Finally, we take great issue with the dissent's assertion that because Harris's rights to her older children were terminated, the "undisputed evidence"[12] "conclusively establishes a ground for termination that supports the trial court's disregard of the jury finding." The dissent goes on to say that "[b]ecause this evidence also constitutes undisputed evidence that Harris's parental relationship endangered the safety of her children and that termination was in their best interest, it is conclusive as well on the finding of best interest as it relates to the issue of C.C.H.'s conservatorship." (Citations omitted.) The dissent's approach would mean that once a parent commits an act permitting termination, there is no need to conduct further inquiry into best interest, something section 161.001(2) specifically requires. Further, this would mean that if a parent ever

---

[11] The dissent agrees that we must review the evidence under a legal-sufficiency standard but then goes on to conduct a factual-sufficiency review. The dissent states that "*even when considered in the light most favorable to Harris*, the evidence supports the trial court's presumed finding." (Emphasis added.) Thus, the dissent makes it clear that its primary approach is not to view the evidence as required but instead to re-weigh the evidence in a light favorable to the trial court, not the jury's verdict. The dissent states that "[w]e may not allow a determination of the best interest of the child to turn on personal preferences, speculative concepts of proper child rearing, or who 'deserves' the child," but this is exactly the kind of analysis the dissent then employs, showing its disfavor for Harris, her lifestyle, and her attitude toward the Department.

[12] Although it is undisputed that Harris's parental rights to her three older children were terminated, Harris and her witnesses testified in opposition of much of the Department's evidence and allegations supporting the termination of her older children.

20

has his or her parental rights terminated, even if it occurred ten years earlier or was based on false testimony, that parent's parental rights to other children could be terminated without any factual inquiry at all. Even if his or her rights were not terminated, the parent could never hope to regain conservatorship. This misguided approach would drastically alter the termination statutes' provisions and would shift the burden of proof to parents defending themselves against termination cases, rather than requiring the State to show by clear and convincing evidence both grounds for termination and the child's best interest. *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2006); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

### Conclusion

Because legally sufficient evidence supported the jury's finding that it was in C.C.H.'s best interest for Harris to be named sole managing conservator, the trial court erred in contravening that finding and instead naming the Department as managing conservator. We reverse the trial court's order and render judgment in conformity with the jury's finding that Harris should be named C.C.H.'s managing conservator.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear;
  Dissenting Opinion by Justice Patterson

Reversed and Rendered

Filed: June 15, 2007

21