

# NUMBER 13-20-00077-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE MATTER OF THE MARRIAGE OF EPHRAIM KARSAGI AND ALYSSA LYN KARSAGI AND IN THE INTEREST OF E.B.K. AND A.Y.K., CHILDREN

### On appeal from the County Court at Law No. 1 of Brazos County, Texas.

## MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Tijerina**
**Memorandum Opinion by Justice Benavides**

Appellant Alyssa Lyn Karsagi appeals from a final decree of divorce that dissolved her marriage to appellee Ephraim Karsagi. In two issues, Alyssa argues that: (1) the trial court's judgment is void because Ephraim was appointed sole managing conservator of the parties' children despite his failure to plead for such relief; and (2) the trial court abused its discretion by entering an order deviating from the standard possession order

based on findings unsupported by the evidence. We affirm.

## I.    BACKGROUND[1]

Ephraim was born and raised in Jerusalem, Israel and Alyssa was born and raised in Crosby, Texas. The parties met in Jerusalem while Alyssa was a graduate student at the Rothberg International School embedded within the Hebrew University in Jerusalem. The parties started dating in July 2010 and were married in December 2011.

Although their departures from Israel were staggered, the parties eventually moved to Texas for Alyssa's work and for Ephraim's schooling. After leaving Israel, Ephraim began a Ph.D program at Texas A & M University. During their marriage, the Karsagis had two children: E.B.K. and A.Y.K., born in November 2015 and July 2017, respectively. The parties dispute the reason their relationship ultimately broke down, but both parties contend they suffered some form of abuse within their relationship. Ultimately, the parties separated on March 5, 2018.

On March 27, 2018, Ephraim filed for divorce and requested that the parties be appointed joint managing conservators of the children. Alyssa filed her answer on April 23, 2018, and her original counterpetition for divorce on June 14, 2018, in which she requested that she be appointed sole managing conservator of the children. That summer, the trial court appointed an amicus attorney for the children and ordered a custody evaluation be performed by Dr. Kim Arredondo, a licensed psychologist. On September 5, 2018, the court ordered the parties to surrender the children's passports to

---

[1] This appeal was transferred to this Court from the Tenth Court of Appeals in Waco by order of the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer).

the court for safekeeping.

On October 18, 2018, the parties had a temporary orders hearing. From the date of the parties' separation to the date of the temporary orders hearing, Ephraim alleged Alyssa had not permitted him to see the children for more than a handful of hours, because she claimed that he "needed to get help." After the temporary orders hearing, the court found that there was "a clear indicia of parental alienation," and ordered the children be immediately turned over to Ephraim. Alyssa was to have no possession of the children until January 18, 2019, when a temporary standard possession order would then commence.

However, three days before the standard possession schedule was to start, Ephraim requested a temporary restraining order and moved for a modification of the temporary orders. Attached to Ephraim's motion was an affidavit from Dr. Arredondo, the child custody evaluator, who attested that while conducting the evaluation she became "concerned for the immediate safety and welfare of the children" based on the lack of child proofing in Alyssa's new residence, Alyssa's inability "to provide appropriate medical care for the children," and her fear that Alyssa was "a flight risk with the children." A hearing was held on this motion on March 12, 2019, and the temporary orders were modified to permit Alyssa four hours of supervised visitation on the Sunday following the first, third, and fifth Fridays of each month.

On April 2, 2019, Dr. Arredondo's 130-page child custody evaluation was filed with the court. For purposes of conducting the evaluation, Dr. Arredondo interviewed both parties, the parties' family members and friends, and former and current therapists and

doctors. She also reviewed the case record, evidence, hearing transcripts, and psychological and psychiatric literature.

According to Dr. Arredondo, Alyssa was "extremely resistive" throughout the course of her psychological evaluation. The evaluation explains that Alyssa sought sole managing conservatorship of the children due to "serious concerns about [Ephraim's] behavior and his mental stability." Alyssa reported witnessing Ephraim putting "bullets in a gun and put[ting] it to his head or mouth in front of Alyssa and [the] children at least 20-40 times." Alyssa also reported that "he threatened to kill the kids." According to the evaluation, Ephraim told Alyssa "that he would make sure that [she] and the children would never be allowed to leave, that he was only looking for jobs in Texas[,] and that he would never allow [them] to return home to Israel."

Ephraim admitted to Dr. Arredondo that he experienced suicidal ideation during the parties' relationship. He also acknowledged in his deposition that he put a gun to his head "between ten and twenty" times. Ephraim specified that this happened once in Alyssa and E.B.K.'s presence, and all the other times that he could remember happened outside of their presence. Ephraim attributed his self-harming behavior and suicidal ideation to "severe psychological duress" from being "trapped under Alyssa's tyranny over [his] life and the kids' lives." Ephraim contended that Alyssa consistently berated and scolded him, and his self-harming behavior was in response to this. However, he denied ever threatening to kill Alyssa or the children.

The evaluation also details Alyssa's mental health history. In 2002, around the age of seventeen, Alyssa was diagnosed by a medical doctor with "schizophrenia and bipolar

4

disorder." Alyssa was evaluated by a psychologist later that same year and was diagnosed with "depression and Asperger's Disorder." The following year, Alyssa was diagnosed by two different psychologists, one of whom diagnosed Alyssa with "depression, anxiety, and obsessive-compulsive symptoms," and the other diagnosed Alyssa with "Asperger's Disorder."

Dr. Arredondo disagreed that Alyssa met the criteria for Autism Spectrum Disorder, and instead concluded that Alyssa met the criteria for Narcissistic Personality Disorder; Factitious Disorder Imposed on Self (formerly known as Munchausen Syndrome) "due to falsely claiming that she has Asperger's Disorder, Central Processing Disorder, auto immune disease, and a broken rib to name a few conditions"; and Factitious Disorder Imposed on Another (formerly known as Munchausen Syndrome by Proxy) "for falsely claiming or causing the diagnosis that [A.Y.K.] had Autism Spectrum Disorder as well as numerous other medical conditions for [A.Y.K.] and [E.B.K.]." Dr. Arredondo did not find credible Alyssa's allegations that Ephraim was violent, and ultimately concluded that Ephraim was "the parent that can best meet the physical and emotional needs of the children." Dr. Arredondo recommended the parties be appointed joint managing conservators and that Alyssa's periods of visitation be continuously supervised.

On July 24, 2019, Alyssa requested a jury trial and paid the requisite jury fee. *See* TEX. R. CIV. P. 216(b). The parties agreed to bifurcate the case; conservatorship would be decided by a jury and the division of property would be decided by the judge at a later date. After a seven-day jury trial, the jury returned a verdict appointing Ephraim as sole managing conservator. The jury also found that grounds existed for divorce and that

5

Alyssa had committed cruel treatment against Ephraim.

On December 16, 2019, the trial court held a final orders hearing. Alyssa made an oral motion for judgment notwithstanding the verdict arguing that, because Ephraim failed to request sole managing conservatorship in his pleadings, the jury's verdict should be set aside. The trial court denied this motion and signed a final decree of divorce the same day. In its decree, the trial court incorporated the jury verdict and appointed Ephraim as sole managing conservator and Alyssa as possessory conservator. Alyssa was also awarded four hours of supervised visits every first, third, and fifth Sunday of each month.

Alyssa requested the trial court state the specific reasons for its deviation from the standard possession order, and the trial court issued the following as the reasons supporting its variance:

1.  The age, developmental status, circumstances, needs, and best interests of the children;

2.  The circumstances of EPHRAIM KARSAGI;

3.  The circumstances of ALYSSA LYN KARSAGI;

4.  EPHRAIM KARSAGI's participation in parenting before the filing of the suit;

5.  ALYSSA LYN KARSAGI's inability and unwillingness to work with EPHRAIM KARSAGI for the best interests of the children during the pendency of the suit;

6.  ALYSSA LYN KARSAGI's history or pattern of behaviors indicating both factitious disorder and factitious disorder imposed on another;

7.  ALYSSA LYN KARSAGI's history or pattern of medical child abuse directed against [the children];

8.  ALYSSA LYN KARSAGI's potential risk of international abduction of the children;

6

9. ALYSSA LYN KARSAGI's history or pattern of behaviors that were not in the children's best interests;

10. The regression of the children while in ALYSSA LYN KARSAGI's possession during the pendency of the case prior to the entry of Temporary Orders;

11. The progress made by the children while in EPHRAIM KARSAGI's custody during the pendency of the suit after Temporary Orders were issued;

12. ALYSSA LYN KARSAGI's persistent efforts that [A.Y.K.] be perceived as on the autism spectrum despite diagnosis to the contrary;

13. ALYSSA LYN KARSAGI's emotional and mental abuse of EPHRAIM KARSAGI in the presence of the children;

14. The jury determination of cruel treatment by ALYSSA LYN KARSAGI directed toward EPHRAIM KARSAGI which rendered further living together insupportable;

15. ALYSSA LYN KARSAGI's history or pattern of denigrating and demeaning EPHRAIM KARSAGI both prior to and during the pendency of this suit and the likelihood of emotional impairment to the children should such denigration and demeaning continue while the children are in ALYSSA LYN KARSAGI'S unsupervised possession;

16. The reported nature and quality of ALYSSA LYN KARSAGI's interactions with the children during the pendency of the case;

17. ALYSSA LYN KARSAGI's observed inability to care for both children simultaneously during the pendency of the case;

18. The demeanor and credibility of the parties and the witnesses presented at trial;

19. The minimum restrictions and limitations on ALYSSA LYN KARSAGI's possession and access that are required to protect the best interests of the children; and

20. The minimum restrictions and limitations on ALYSSA LYN

7

KARSAGI's possession and access that are required to protect the children from the risk of abduction by ALYSSA LYN KARSAGI.

See TEX. FAM. CODE ANN. § 153.258.

This appeal followed.

## II.    SOLE MANAGING CONSERVATORSHIP

In her first issue, Alyssa contends that the trial court's final decree of divorce is void, as it appoints Ephraim as sole managing conservator of the children, despite his failure to plead for such relief. Ephraim argues that this issue has been waived.

### A.    Applicable Law & Standard of Review

"The judgment of the court shall conform to the pleadings, the nature of the case proved, and the verdict, if any, and shall be so framed as to give the party all the relief to which he may be entitled either in law or in equity." TEX. R. CIV. P. 301. However, "[i]n child custody cases, where the best interests of the child are the paramount concern, technical pleading rules are of reduced significance." *Messier v. Messier*, 389 S.W.3d 904, 907 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (collecting cases). "[O]nce the child is brought under its jurisdiction by suit and pleading cast in terms of custody and control, it becomes the duty of the court in the exercise of its equitable powers to make proper disposition of all matters comprehended thereby in a manner supported by the evidence." *Leithold v. Plass*, 413 S.W.2d 698, 701 (Tex. 1967). When a party fails to specially except to what it claims are deficient pleadings, we are to "construe the pleadings liberally in favor of the pleader." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 897 (Tex. 2000).

8

Even where an issue is not raised by the pleadings, it may nonetheless be treated in all respects as though it has been raised by the pleadings if it is tried by express or implied consent. TEX. R. CIV. P. 67. Trial by consent is a doctrine that should be applied only in the "exceptional case in which it clearly appears from the record as a whole that the parties tried the unpled issue." *See In re A.B.H.*, 266 S.W.3d 596, 600 (Tex. App.—Fort Worth 2008, no pet.); *see also Dahl v. Dahl*, No. 10-19-00260-CV, 2021 WL 5637679, at *2 (Tex. App.—Waco Dec. 1, 2021, no pet.) (mem. op.). Trial by consent "is precluded where proper objection is made on the record before submission to the jury." *Crowson v. Bowen*, 320 S.W.3d 486, 488 (Tex. App.—Fort Worth, no pet.). To determine whether an issue was tried by consent, we examine the record not for evidence of the issue, but rather for evidence of trial of the issue. *In re A.B.H.*, 266 S.W.3d at 600. "Absent trial by consent, judgment on an unpled action is void." *Webb v. Glenbrook Owners Ass'n, Inc.*, 298 S.W.3d 374, 380 (Tex. App.—Dallas 2009, no pet.).

A party to a suit affecting the parent-child relationship may demand a jury trial on the issue of conservatorship. TEX. FAM. CODE ANN. § 105.002(c)(1). When submitting a jury charge, "[t]he court shall submit the questions, instructions and definitions . . . which are raised by the written pleadings and the evidence." TEX. R. CIV. P. 278. If a party believes her opponent's pleadings are insufficient to give rise to a specific question, definition, or instruction in the jury charge, she must present an objection to the charge before it is submitted to the jury. *See* TEX. R. CIV. P. 274; *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 830 (Tex. 2012); *see also In re J.M.M.*, No. 13-20-00086-CV, 2021 WL 4897665, at *6 (Tex. App.—Corpus Christi–Edinburg Oct. 21, 2021, no pet.) (mem.

9

op.). Failing to raise an objection to a jury charge prior to its submission not only waives any complaint to the charge on appeal, but it also "squanders judicial resources, decreases the accuracy of trial court judgments and wastes time the judge, jurors, lawyers, and parties have devoted to the case." *Cruz*, 364 S.W.3d at 830; *see* TEX. R. CIV. P. 272, 274.

## B.    Analysis

While Alyssa requested that she be appointed sole managing conservator of the children, Ephraim only pleaded for joint managing conservatorship. We examine the record for evidence that appointing Ephraim as sole managing conservator was tried by consent. *See In re A.B.H.*, 266 S.W.3d at 600.

In his trial summary filed on October 31, 2019, Ephraim described the issue of conservatorship as follows: "Each parent now seeks managing conservatorship of the children. Both parties have ple[aded] for Sole Managing Conservatorship or, alternatively, Joint Managing Conservatorship with the right to designate the primary physical residence of the children." On the first day of trial, during Ephraim's cross-examination, counsel for Alyssa asked, "And now you're asking this Court to give you unrestricted domicile as part of the sole managing conservatorship, correct?" Ephraim equivocated in his answer to this question, and Alyssa's counsel moved on. During closing argument, the attorneys for both parties asked the jury to appoint their client as sole managing conservator of the children. In her closing argument, the amicus attorney for the children recommended that Ephraim be appointed sole managing conservator of the children and that Alyssa be appointed possessory conservator. Alyssa did not object to any of the

10

foregoing.

When an issue is developed at trial and submitted in the jury charge without objection, it has been tried by consent. *Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009). The facts surrounding the jury charge in this case are analogous to those in *In re Walters*, 39 S.W.3d 280, 289–90 (Tex. App.—Texarkana 2001, no pet.). The Sixth Court of Appeals described those facts as follows:

> The record reveals that the parties agreed on the jury charge at the end of trial and that neither party objected to it.
>
> . . . .
>
> The jury was charged on the meaning of the terms conservator and joint managing conservator, and the factors to consider in determining whether to name a party joint managing conservator. The jury was also charged as to the respective rights and duties of sole managing conservators. In addition, the jury was charged that it was to consider the qualifications of each party without regard to their gender or marital status in determining which party to appoint sole managing conservator, whether to appoint a party joint managing conservator, and the terms and conditions of conservatorship.
>
> The jury charge consisted of two questions. The first question asked, "Who should be appointed managing conservator of the child?" The jury was instructed to choose either [appellee], [appellant], or both. The second question, which the jury was to answer if they named [appellee] and [appellant] joint managing conservators, asked which of them should have the right to determine [the child]'s primary residence.

*Id.* at 289.

In this case, the parties agreed on the jury charge at the end of the trial, and Alyssa solely objected to the charge on the basis that it omitted a question on the issue of family violence.[2] *See id.* The jury charge contained information concerning the respective rights

---

[2] However, the jury charge did include a definition of family violence that partially mirrored the

11

and duties of sole managing conservators, joint managing conservators, and possessory conservators. *See id.* Additionally, the jury was instructed to consider certain factors in determining whether the appointment of the parties as joint managing conservators was in the children's best interest. *See id.* The jury was instructed to consider the qualifications of each party in determining which party to appoint sole managing conservator or whether to appoint the parties joint managing conservators, and to disregard the gender and marital status of each party in making these determinations. *See id.* The charge asked the jury to determine "[w]ho should be appointed managing conservator of the children" and permitted the jury to "answer by naming one parent sole managing conservator or by naming both parents joint managing conservators." *See id.*

We conclude that, based on the development of the issue at trial and Alyssa's failure to object to the charge prior to its submission, the issue of Ephraim's appointment as sole managing conservator was tried by consent. *See id.* at 290; *Ingram*, 288 S.W.3d at 893.

Nevertheless, in her reply brief and during argument before this Court, Alyssa contended that the oral motion for judgment notwithstanding the verdict raised at the final orders hearing over a month after the jury returned its verdict was sufficient to preserve this issue.[3] A judgment notwithstanding the verdict is appropriate when the evidence is

_____

Texas Family Code's definition and instructed the jury that "[a] person may not be appointed a joint managing conservator if that person has a history or pattern of past or present child neglect or of physical abuse directed against a parent, spouse, or a child." *See* TEX. FAM. CODE ANN. §§ 71.004(1), 153.004(b).

[3] We note that after her motion for judgment notwithstanding the verdict was denied, counsel for Alyssa conceded that "[she] agree[d] that based on the jury . . . verdict that [her] client should be appointed possessory conservator." The final decree of divorce proposed by Alyssa and admitted as an exhibit during the final orders hearing also appointed Ephraim as sole managing conservator and Alyssa as possessory conservator.

conclusive and one party is entitled to prevail as a matter of law, or when a legal principle precludes recovery. *Hous. Med. Testing Serv., Inc. v. Mintzer*, 417 S.W.3d 691, 695 (Tex. App.--Houston [14th Dist.] 2013, no pet.). The trial court denied Alyssa's motion for judgment notwithstanding the verdict and entered its final decree of divorce appointing Ephraim sole managing conservator and Alyssa as possessory conservator "based upon the jury verdict issued on November 14, 2019."

Even if we concluded that this issue was not tried by consent, we are skeptical that Alyssa's motion for judgment notwithstanding the verdict properly preserved any error. *See* TEX. R. APP. P. 33.1(a)(1)(B) ("As a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a timely request, objection or motion that . . . complied with the requirements of the . . . Texas Rules of Civil . . . Procedure."); TEX. R. CIV. P. 274 ("Any complaint as to a question definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections.").

In cases where the issue of conservatorship has been decided by a jury, the trial court has no discretion to set aside the verdict. *See* TEX. FAM. CODE ANN. § 105.002(c)(1)(A) ("[T]he court may not contravene a jury verdict on . . . the appointment of a sole managing conservator."); *Lenz v. Lenz*, 79 S.W.3d 10, 20 (Tex. 2002); *Epps v. Deboise*, 537 S.W.3d 238, 242 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Alexander v. Rogers*, 247 S.W.3d 757, 761 (Tex. App.—Dallas 2008, no pet.); *Harris v. Tex. Dep't. of Fam. & Protective Servs.*, 228 S.W.3d 819, 822 (Tex. App.—Austin 2007, no pet.); *Corrales v. Dep't. of Fam. & Protective Servs.*, 155 S.W.3d 478, 488 (Tex. App.—El Paso

2004, no pet.) ("[S]ubsection (c)(1)(A) mandates that the court may not contravene a jury verdict concerning the appointment of a sole managing conservator. Simply stated, the court may not enter a judgment notwithstanding the verdict."); *see also In re L.S.*, No. 04-20-00383-CV, 2021 WL 6127924, at *7 (Tex. App.—San Antonio Dec. 29, 2021, no pet.) (mem. op.).

In argument before this Court, Alyssa contended that the Texas Family Code gives the trial court the ultimate authority to determine conservatorship. *See* TEX. FAM. CODE ANN. § 153.005(a)(1) ("In a suit . . . the court . . . may appoint a sole managing conservator or may appoint joint managing conservators[.]"). However, we aim to construe statutes in harmony with one another. *See State v. Newton*, 179 S.W.3d 104, 109 (Tex. App.—San Antonio 2005, no pet.); *Duarte v. Disanti*, 292 S.W.3d 733, 735 (Tex. App.—Dallas 2009, no pet.). Thus, we construe Texas Family Code § 153.005(a) and § 105.002(c)(1)(A) together and conclude that the trial court was permitted to appoint Ephraim sole managing conservator because the jury returned a verdict appointing him sole managing conservator. *See* TEX. FAM. CODE ANN. §§ 105.002(c)(1)(A), 153.005(a).

Alyssa requested a jury verdict on the issue of conservatorship, and she received a jury verdict on the issue of conservatorship. "Having failed to except to the lack of pleadings at any point during trial," Alyssa has waived this issue for our review. *See Murray v. O & A Express, Inc.*, 630 S.W.2d 633, 637 (Tex. 1982).

We overrule Alyssa's first issue.

### III. DEVIATION FROM STANDARD POSSESSION ORDER

In her second issue, Alyssa argues that the trial court abused its discretion by

deviating from the standard possession based on findings unsupported by the evidence.

## A.    Standard of Review

A trial court is given wide latitude in determining issues pertaining to possession and access, and an appellate court will only reverse the court's order if it abused that discretion. *Smith v. Smith*, 143 S.W.3d 206, 214 (Tex. App.—Waco 2004, no pet.); *In re T.J.S.*, 71 S.W.3d 452, 458 (Tex. App.—Waco 2002, pet. denied); *In re S.H.*, 590 S.W.3d 588, 592 (Tex. App.—El Paso 2019, pet. denied); *Syed v. Masihuddin*, 521 S.W.3d 840, 847 (Tex. App.—Houston [1st Dist.] 2017, no pet.). A trial court abuses its discretion if it acts without reference to any guiding rules or principles; in other words, if it acts arbitrarily or unreasonably. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Syed*, 521 S.W.3d at 847.

There is a rebuttable presumption that the standard possession order: (1) provides reasonable minimum possession of a child for a parent named as a possessory conservator or joint managing conservator; and (2) is in the best interest of the child. TEX. FAM. CODE ANN. § 153.252. However, if there is sufficient evidence to rebut this presumption, the trial court may deviate from the standard possession order. *In re N.P.M.*, 509 S.W.3d 560, 564 (Tex. App.—El Paso 2016, no pet.) (citing TEX. FAM. CODE ANN. § 153.256). When deviating from the standard possession order, the trial court may consider: (1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and (3) any other relevant factor. TEX. FAM. CODE ANN. § 153.256.

15

If a trial court deviates from the standard possession order, a party may request that the trial court specify its reasons for the variance. *Id.* § 153.258. The request for findings supporting the variance must conform to the Texas Rules of Civil Procedure. *Id.* § 153.258(b); TEX. R. CIV. P. 296. When conflicting evidence is presented, we will not disturb the trial court's credibility determinations and we presume that it resolved any conflict in favor of its decision. *In re N.P.M.*, 509 S.W.3d at 565.

## B.    Analysis

Pursuant to Alyssa's request, the trial court issued findings of fact concerning the deviation from the standard possession order. *See* TEX. FAM. CODE ANN. § 153.258. The trial court listed twenty findings that it determined necessitated a deviation from the standard possession order. Alyssa challenges two of those findings and claims there is no evidence in the record to support them. Specifically, Alyssa challenges the trial court's findings that Alyssa poses a "potential risk of international abduction of the children" and that she has a "history or pattern of medical child abuse directed against" the children.

Alyssa does not challenge the trial court's finding that it deviated from the standard possession order due to Alyssa's "emotional and mental abuse of [Ephraim] in the presence of the children." When findings of fact are filed and are unchallenged, they occupy the same position and are entitled to the same weight as a jury's verdict; they are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Inimitable Grp., L.P. Westwood Grp. Dev. II, Ltd.*, 264 S.W.3d 892, 902 & n.4 (Tex. App.—Fort Worth 2008, no pet.). Thus, we defer to unchallenged findings of fact that are

16

supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014).

Ephraim testified at trial that in the early morning on October 1, 2017, he discussed with Alyssa his decision to convert to Christianity. According to Ephraim, Alyssa responded by "[y]elling, shouting, screaming that [he] betrayed her to the point where at that time she began talking about hiring a lawyer and making sure that [Ephraim] [would] not see the kids unless she sa[id] [he] c[ould]." Ephraim testified that he had recorded Alyssa's threats on his phone "[b]ecause [he] wanted some proof of what happen[ed] indoors, behind closed doors." Alyssa noticed Ephraim recording, grabbed his phone away from him, and paused the recording. She then proceeded to call Ephraim's mother "to tell her [Ephraim] cheated on [Alyssa] with a blond girl, which [he] did not."

After the phone call to his mother, Ephraim noticed that Alyssa was trying to delete the recording he made of the parties' argument. Ephraim "reached and grabbed [his] phone" back from Alyssa "to prevent her from deleting the recording." Later, Alyssa called the police about this incident. Officer Sartell of the Bryan Police Department responded to the call.

According to the police report,

[Ephraim] told [Sartell] he and his wife were arguing because he is Jewish and practices Judaism but is going to convert to Christianity. He said they have been arguing about this a couple of days[,] and today he recorded his wife as she threatened to leave and take the kids and not allow him to see his children. [Ephraim] said his wife caught him recording her and forcibly took his phone from him. [Ephraim] said she pushed and shoved him until she got the phone[,] and he took it back from her. [Sartell] was skeptical about this claim[,] but [Ephraim] gave [Sartell] his phone and [Sartell] was able to listen to the conversation. It goes along just as he said until the point where the wife begins to tell [Ephraim] what a horrible person he is. At that

17

point she exclaims 'are you recording this[,]' and a scuffle begins where she is trying to take his phone.

The police report also details that Ephraim was holding A.Y.K. during the parties' argument.

Alyssa also does not challenge the trial court's finding that she had an "observed inability to care for both children simultaneously during the pendency of the case," or that the "reported nature and quality of [Alyssa]'s interactions with the children during the pendency of the case" warranted a deviation from the standard possession order. Ken Ringo, one of the initial supervisors of Alyssa's visits with the children, felt that "she wasn't there as much as to spend time with [the children] as to examine them to see what kind of injuries, what kind of marks could be on them. That was constant throughout every visit." Ringo's records indicate that at a supervised visit on April 21, 2019, E.B.K. tried to hug Alyssa and Alyssa "stop[ped] him" and "push[ed] him away."

Ringo testified that it was typical for Alyssa to be focused on one of the children while the other child wandered unobserved into potential danger. For instance, one visit was at the Bryan Library which has "some stairs." During the visit, A.Y.K. "ended up tumbling down the steps." Ringo waited "to see if Alyssa would run over" to A.Y.K., "but she did not witness it at the time." At another visit, E.B.K. "wandered down the hall" while Alyssa was with A.Y.K. It took "[s]even minutes before Alyssa went to go find [E.B.K.]"

In the section on supervised visitation in the trial court's final decree of divorce, the trial court specifically found that "credible evidence has been presented that ALYSSA LYN KARSAGI has a history or pattern of medical child abuse directed against [the children] . . . [and] presents a potential risk of international abduction of the children." In

18

argument before this Court, Alyssa contended that the findings of fact in the judgment should control, and that the latter findings of fact could not constitute independent findings for deviation from the standard possession schedule. This contradicts the general rule that a trial court should not include its findings in a judgment and that latter findings will control if they conflict with an initial finding. *See* TEX. R. CIV. P. 299a; *In re C.T.H.S.*, 311 S.W.3d 204, 206 n.1 (Tex. App.—Beaumont 2010, pet. denied).

However, even if we concluded that the trial court's findings recited in its judgment must have had support from the record, there was sufficient evidence presented that Alyssa posed a potential risk of international child abduction.[4] On the motion of a party or on the court's own motion, the court may impose preventative measures it determines necessary, including deviating from the standard possession order and requiring supervised visitation, if credible evidence is presented indicating a potential risk of the international abduction of a child. TEX. FAM. CODE ANN. §§ 153.501, 153.503. Texas courts are vested with "broad discretion in determining which preventive measures to impose." *In re Sigmar*, 270 S.W.3d 289, 307 (Tex. App.—Waco 2008, orig. proceeding [mand. denied]).

According to § 153.502(a), to determine whether there is a risk of the international abduction of a child by a parent of the child, the court shall consider evidence concerning

---

[4] Alyssa complained in her reply brief that "[t]he trial court omitted any findings that would be required to impose additional restrictions based on a risk of international child [abduction]." However, in her initial brief, Alyssa did not complain that the trial court's findings, even if supported by sufficient evidence, would not permit a deviation from the standard possession order. Rather, she contended that the trial court's findings were not supported by sufficient evidence. We therefore do not address the contention that the trial court's findings were inadequate to deviate from the standard possession order. *See* TEX. R. APP. P. 38.3; *Reyes v. Burrus*, 411 S.W.3d 921, 923 n.2 (Tex. App.—El Paso 2013, pet. denied) (explaining that issues cannot be raised for the first time in a reply brief).

whether the parent:

(1)    Has taken, enticed away, kept, withheld, or concealed a child in violation of another person's right of possession of or access to the child, unless the parent presents evidence that the parent believed in good faith that the parent's conduct was necessary to avoid imminent harm to the child or the parent;

(2)    Has previously threatened to take, entice away, keep, withhold, or conceal a child in violation of another person's right of possession of or access to the child;

(3)    Lacks financial reason to stay in the United States, including evidence that the parent is financially independent, is able to work outside of the United States, or is unemployed;

(4)    Has recently engaged in planning activities that could facilitate the removal of the child from the United States by the parent, including:

    a.    Quitting a job;

    b.    Selling a primary residence;

    c.    Terminating a lease;

    d.    Closing bank accounts;

    e.    Liquidating other assets;

    f.    Hiding or destroying documents;

    g.    Applying for a passport or visa or obtaining other travel documents for the parent or the child; or

    h.    Applying to obtain the child's birth certificate or school or medical records;

(5)    Has a history of domestic violence that the court is required to consider under section 153.004; or

(6)    Has a criminal history or a history of violating court orders.

TEX. FAM. CODE ANN. § 153.502(a).

Evidence was presented indicating that Alyssa "lacks financial reason to stay in the United States," "is able to work outside of the United States," and "is unemployed." *See id.* § 153.502(a)(3). Alyssa messaged Ephraim the following on Our Family Wizard[5] while their divorce was pending:

- I have no money or job. My degree in Middle Eastern studies is only valuable in the Middle East. That's why I got it . . . to live there in the Middle East. You know this, please.

- Please recall that my degree is in Middle Eastern Islamic Studies. That degree is really only useful in the middle east or outside of [T]exas[,] as we discussed. I moved to Israel where I met and married you because you promised that we would return[,] so I had no need to worry about employment. That is where my degree allows me employment, not here and certainly not Houston.

- You had and still have an offer in Israel. If we can mutually agree then we can settle and go and both of us would have careers and a chance at success. I would have opportunities in Israel for employment in my field. We would be back where we met and married, back home where we agreed to live, even in divorce, we had an agreement. We would have your family's support. I will never have the opportunities here that I have in Israel[,] and you know this. Please will you compromise on anything at all?

Dr. Arredondo testified at trial that "the flight risk issue was . . . mostly because . . . Alyssa repeatedly t[old] me she was not going to stay here, um, that she couldn't find work here, that she had to leave Texas, and that she was applying to jobs outside of the state."

There was also evidence that Alyssa "previously threatened to take, entice away, keep, withhold, or conceal a child in violation of" Ephraim's right of possession of or access to the child. *See id.* § 153.502(a)(2). While the suit was pending, the Brazos

---

[5] The co-parenting app through which the parties were ordered to confine their communications during the pendency of the divorce.

County Standing Order was in effect and applied to both parties. The standing order required the parties to refrain from "[h]iding or secreting the child from the other parent" during the pendency of the divorce. Evidence was presented that Ephraim asked Alyssa numerous times to see the children after the parties separated. Despite this, evidence was also presented that Alyssa only permitted Ephraim to have about three hours of supervised access to the children from March 2018 until the temporary orders were put in place in October 2018. During trial, Alyssa was asked, "Did you threaten to leave and take the kids because [Ephraim] converted [to Christianity]?" Alyssa responded, "Not because he converted."

Evidence was also presented indicating Alyssa was engaging in "planning activities that could facilitate the removal of the child[ren] from the United States." *See id.* § 153.502(a)(4). Shortly after the parties initially separated in March 2018, Alyssa commented on her own Facebook status, stating, "We are moving very soon." In the same thread, Alyssa later asked about jobs in Israel, stating, "I can't keep . . . [my] job in Jerusalem or that would be the first place I'd go. You don't have any connections for a job with comparable pay there do you? Literally anywhere in Israel. All of our family is there." When asked about these comments during trial, Alyssa acknowledged that she was contemplating going to Jerusalem at that point, despite the parties' separation.

Ephraim also texted Alyssa about these posts, and in response, Alyssa stated, "We have to move[, ] [t]he lease is up," and "Why would we not move?" Eventually, Alyssa did move within the state and initially declined to disclose her new address to Ephraim. At the final hearing, Ephraim testified about his concern that Alyssa was making plans to

abscond with the children. According to Ephraim, at a recent supervised visit, he noticed that Alyssa had arrived with two car seats in her car. This caused him concern "because Alyssa is not—under the supervised visitation schedule, she is not to put the kids in the car." Ephraim expressed that he feared someone would "take the kids and put them in the car" and that he would not see them again.

The trial court was required to consider whether Alyssa was engaging in these planning activities as part of a safety plan to flee from family violence. *See id.* § 153.502(a-1). While Alyssa testified that Ephraim was violent towards her and the children, conflicting testimony was also presented by Ephraim and Dr. Arredondo that cast doubt on whether Ephraim was violent towards anyone other than himself. The trial court was in a better position to evaluate the credibility of the parties, and we must not substitute our judgment for that of the trial court on whose testimony should be credited or discredited. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *Syed*, 521 S.W.3d at 850. That is not to say, though, that Ephraim pointing a gun at himself in front of Alyssa and E.B.K. should be ignored. Threats of suicide are often part and parcel of coercive, controlling behavior and violent conduct. *See, e.g., Boyd v. Palmore*, 425 S.W.3d 425, 428 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Turner v. State*, No. 01-17-00563-CR, 2018 WL 5986440, at *4 (Tex. App.—Houston [1st Dist.] Nov. 15, 2018, no pet.) (mem. op., not designated for publication); *Nickelson v. State for Prot. of Nickelson*, No. 04-17-00113-CV, 2018 WL 1831679, at *3 (Tex. App.—San Antonio Apr. 18, 2018, no pet.) (mem. op.); *Scott v. Wooley*, No. 02-19-00318-CV, 2020 WL 7063292, at *5 n.9. (Tex. App.—Fort Worth Dec. 3, 2020, no pet.) (mem. op.). Additionally, threats

23

of suicide may contribute to a finding that a parent engaged in a course of conduct that is detrimental to a child's physical or emotional well-being. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied); *Scott*, 2020 WL 7063292, at *5 n.9.

Regardless, evidence sufficient to support an affirmative finding on only one of the factors in subsection (a) of Texas Family Code § 153.502 may constitute "credible evidence of a risk of abduction" sufficient for the trial court to then consider evidence relevant to the required factors under subsection (b) and the permissive factors under subsection (c). *In re Sigmar*, 270 S.W.3d at 300; *Elshafie v. Elshafie*, No. 13-10-00393-CV, 2011 WL 5843674, at *5 (Tex. App.—Corpus Christi–Edinburg Nov. 22, 2011, no pet.) (mem. op.). Under subsection (b), if the trial court finds there is credible evidence of a risk of abduction, the trial court is then required to consider evidence of (1) strong familial, emotional, or cultural ties to another country, particularly a country that is not a signatory to or compliant with the Hague Convention on the Civil Aspects of International Child Abduction; and (2) whether the parent lacks strong ties to the United States, regardless of whether the parent is a citizen or permanent resident of the United States. TEX. FAM. CODE ANN. § 153.502(b).

Alyssa, Ephraim, and the children have both Israeli and American citizenship. According to Dr. Arredondo's evaluation, Alyssa believed the parties' goal during their marriage was "to get back to Israel as soon as possible." Alyssa also reported to Dr. Arredondo that Ephraim "[t]old [her] that he would make sure that [she] and the children would never be allowed to leave, that [Ephraim] was only looking for jobs in Texas[,] and that he would never let [them] return home to Israel." In her testimony, Alyssa stated that

24

she "was relieved" when Ephraim texted her after filing for divorce about applying for a job in Israel, and that she "thought he was going to fulfill his promise of getting [them] to a place where [they] would all live as a family." Alyssa's assertion on Facebook that "[a]ll of [her] family is" in Israel and her referral to the country as "home" indicate a strong familial and emotional tie to the country.

Some evidence was also presented that indicated Alyssa did not have strong ties to the United States, despite being a citizen. In a text message sent to Ephraim concerning her parents, Alyssa stated, "They are DEEPLY disturbed people who abused me my entire life. I left the country to start over and ESCAPE. I came back to pay my debts[,] but I stayed for YOU." She also went on to state that she wished she "had never left Israel." In a text message about Ephraim's potential job opportunities, Alyssa revealed that "[r]egardless of what happens between us, I am leaving." Alyssa also stated, "I have always hated this place and through unhealthy relationships I was sucked back in[, ]but I cannot and will not stay[. ]There are 49 other American locations and other global ones."

Based on the evidence supporting the trial court's unchallenged findings and its finding that Alyssa posed a "potential risk of international abduction of the children," we conclude the trial court did not abuse its discretion in deviating from the standard possession schedule and awarding Alyssa supervised visitation only.[6]

---

[6] Because these findings alone are sufficient to support a deviation from the standard possession order, we do not address the trial court's other findings, including whether Alyssa had a history or pattern of medical child abuse directed against the children. *See* TEX. FAM. CODE ANN. §§ 153.501, 153.503; TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."); *Syed v. Masihuddin*, 521 S.W.3d 840, 850 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("[B]ecause we conclude that the findings outlined above are supported by sufficient evidence to allow the trial court to make its determination deviating from the standard possession order and that the trial court's determination did not constitute an abuse of discretion, we need not analyze every one of the remaining findings of fact.").

We overrule Alyssa's second issue.

## IV.  CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Delivered and filed on the
24th day of March, 2022.